THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
VINCENT JACKSON, Defendant-Appellant.

First District (2nd Division)   No. 85—2919

Opinion filed March 17, 1987.

Barry Stewart Silver, of Chicago (L. Wolfe Finkle, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Christopher J. Cummings, and Michael J. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals his murder conviction and extended term sentence of 60 years' imprisonment. He raises as issues on review whether: (1) the circuit court erred in admitting in evidence a weapon not used in the murder; (2) he was proved guilty beyond a reasonable doubt; (3) the extended term sentence of 60 years was excessive; and (4) extended terms are unconstitutional. For reasons set forth below, we affirm.

Defendant, Vincent Jackson, was tried and convicted by a jury of murder. The extended sentence was imposed by virtue of the brutal and heinous nature of the offense. Ill. Rev. Stat. 1983, ch. 38, pars. 9—1, 1005—8—2.

On September 5, 1983, defendant attended a picnic at his girlfriend's house. The latter's sister was there with her boyfriend, the victim, Steven Carter. According to witnesses, the victim was "being funny" and "making smart remarks" to defendant, telling the latter that he had "skinny legs" and that he talked "like he has crap in his mouth." The victim then began sparring with defendant and may have hit him in the mouth. Defendant claimed that the victim had chipped his tooth and asked what he was going to do about it. The victim denied hitting defendant. Defendant then went to his car, opened the trunk and reached inside. The victim's girlfriend followed defendant to his car and told him not to do anything stupid. Defendant returned to the picnic and once again asked the victim what he was going to do about the chipped tooth. The victim responded: "[N]ot a damn thing," and "Man, I didn't hit you in the mouth." Defendant returned to his car and drove off.

The victim and his girlfriend remained at the picnic for a while longer, went to a second picnic, and finally went home at about 11:30 p.m. The victim then left for work, taking his pistol with him, which was unusual. He worked as a parking attendant at a lake shore condo-

minium and arrived there at midnight. He and his girlfriend talked extensively by phone between midnight and 1 a.m.

An unarmed security guard, on the midnight to 8 a.m. shift at the condominium, saw the victim alive in the garage shortly after midnight. At about 1 a.m., the guard went to an apparently vacant ground-level apartment which the staff used for its washroom facilities. Looking out the back-room window, he saw a black male, whom he subsequently identified as defendant, on his hands and knees and about 5 feet away, dressed in a dark short jacket, dark pants, cap and scarf and who was holding a dark revolver he believed was a .38-caliber revolver. Defendant was near the garage entrance and was apparently watching the garage. The area was well lighted by flood lights and by lights inside the garage. The witness had an unobstructed view of defendant, who then began crawling towards the garage entrance. After moving 15 to 20 feet, defendant got up and ran into the garage shooting. The guard saw the bullets fire but did not see the object of the shooting. There were at least five consecutive shots fired.

The guard, who had watched all this while kneeling behind the window, radioed his headquarters and reported the shooting. This call was logged at 1:15 a.m. There was no phone in the apartment with which to call the police; instead, he remained where he was and watched the garage. It is unclear from the record as to precisely when the police were called.

Five to ten minutes later, the guard saw defendant come out of the garage and walk southward toward the parking lot. He saw his full face and profile. He saw no blood on him. The guard went outside after defendant passed by, but saw no one. He returned to the room. After hearing a car outside and believing it to be either the police or other security personnel, the guard again went outside. He then saw defendant standing by the trunk of a burgundy, 1981 or 1982 Pontiac, which he thought was a two-door model. Defendant, who was about 30 feet away, said, "How you doing?" The guard responded "All right." The license number prefix was noted as "IT," but the guard was unable later to recall the subsequent numbers. Defendant got into the car on the passenger side. A black male was driving as the car drove off.

As the car was leaving, the guard's supervising sergeant drove up, attempted to follow the car, but lost it almost immediately. The sergeant identified the car as a late model, maroon, four-door Pontiac or Chevrolet. The sergeant and guard then went into the garage where they found the victim face down in a pool of blood. The police

arrived a few minutes later.

The guard described the offender as a dark-complected black man, of slender build, 5 feet 7 inches tall, weighing 130 pounds, wearing a mustache and beard. This description apparently fit defendant. About 10 hours later, the guard identified defendant in a lineup and the car at the police auto pound. He also identified defendant in court and there identified a photograph of defendant's car.

Investigating police officers found the victim dead, face down in a pool of blood, inside the garage, about 150 feet from the entrance. They also found blood in two places in the garage where the victim apparently had been shot and wounded while attempting to escape his assailant. Both areas of blood were closer to the garage entrance. Blood was also found on and around parked cars which were bullet damaged. There were indications that the victim might have tried to hide beneath one of the parked cars. The police recovered blood samples, all of which appeared to be the victim's, and two expended ".38 special" bullets as well as bullet fragments from three other spent ".38 special" bullets. They did not find the victim's gun or any other weapon.

An autopsy revealed that the victim died of multiple gunshot and stab wounds of which 15 stab wounds and 3 gunshot wounds were primary. The victim was shot in the left arm from the front, in the right thigh from the back, and in the right calf, breaking the leg, from the left. He had a stab wound in the back and another in the left arm and had been cut on the right wrist. He also had 13 stab wounds in the neck and chest with 8 wounds to the heart, multiple wounds to the left lung, and others to the jugular vein, the liver, kidney and stomach. The medical examiner noted that the wounds might not have spurted blood due to reduced blood pressure from previous loss of blood.

Relying upon the guard's description of the assailant, his car and its license number, and after talking to the victim's girlfriend, the police arrested defendant at his mother's house and seized his car, a four-door, 1981 burgundy Pontiac, license number "IT 4263." The police found five ".38 special" spent cartridge casings in defendant's wastebasket. Defendant stated that he intended to reload them for use in his legally registered pistol, a .357 Colt Trooper. The .357 Colt was later recovered from defendant's girlfriend the morning after the murder and was loaded with ".38 special" bullets.

The police laboratory determined that none of the expended bullets recovered at the crime scene or the five spent cartridge casings found in defendant's room had been fired by defendant's .357 pistol.

The five spent ".38 special" cartridge casings recovered from defendant's wastebasket were the same caliber and made by the same manufacturer as the six live cartridges that were found in his .357 pistol. There was no method by which it could be determined whether or not the five spent bullets and fragments were fired from the five empty cartridge casings found in defendant's wastebasket according to an expert witness.

After defendant's conviction by the jury, his motion for a new trial was denied and he was thereafter sentenced as above noted. He appeals.

I

Defendant initially asserts that the circuit court erred in allowing testimony to be given concerning his .357 revolver and in eventually allowing its admission into evidence. When the revolver was first referred to in police testimony, defendant did not object until 16 questions were asked and answered concerning the weapon during the direct examination of Officer Richard Popovitz. On cross-examination defendant asked the officer a series of 10 more questions about the gun but was unsuccessful in eliciting the responses desired, which the court ruled inadmissible. Defendant then moved for a mistrial premised on the introduction of the gun. The court denied the motion for mistrial. Apparently referring to the irrelevance of the weapon, the court stated: "You can make the most of [the gun's irrelevance]. Mistrial denied. If you knew that there was a possibility of [this gun being presented], you should have come in for a Motion in Limine."

The State's ballistics testimony established that defendant's .357 was not the murder weapon. The five spent ".38 special" bullets and fragments found at the scene were fired from another gun. That unrebutted testimony further established that the five spent .38-caliber cartridge casings found in defendant's wastebasket had not been fired from defendant's .357 Colt either, but from another gun. Defendant renewed his motion for mistrial. The State's offer of defendant's revolver was premised, in part, upon the fact that the five spent .38-caliber cartridge casings found in defendant's room, also not fired from defendant's weapon, were important circumstantial evidence. The motion was denied.

The court then asked defendant's counsel if he had another motion. Counsel moved to strike the testimony, but withdrew, stating, "I can't have the testimony stricken," and observing that if stricken, counsel would be precluded from arguing the absence of any connection between the spent bullets and defendant's weapon, apparently

preferring to cross-examine the witness on the evidence. The court itself considered whether it should strike the testimony *sua sponte* and decided not to. The court reversed its earlier denial of the mistrial motion and reserved ruling on that motion because it believed that defendant eventually would move to strike the evidence.

At the close of the State's case, the prosecution moved to have the gun admitted into evidence, to which defendant objected. The court sustained the objection and barred the weapon.

Defendant testified about his ownership of the .357 Colt and that it was left at his girlfriend's house for her protection. At the close of defendant's case, the defense moved to admit in evidence the receipt for the gun's purchase and its registration, which was allowed over the State's objection based upon a discovery violation. Thereafter, the State moved again to admit the gun, which was now allowed into evidence because of its relation to the gun-related defense exhibits, the sales receipt and registration.

■ Defendant correctly asserts that the admission of this weapon into evidence was error. As the circuit court itself noted, it was not involved in the crime. (*People v. Rickard* (1981), 99 Ill. App. 3d 914, 918, 425 N.E.2d 1317, *appeal denied* (1982), 88 Ill. 2d 554; *People v. Suerth* (1981), 97 Ill. App. 3d 1005, 423 N.E.2d 1185; *People v. Sanders* (1978), 59 Ill. App. 3d 650, 655, 375 N.E.2d 921; *People v. Wade* (1977), 51 Ill. App. 3d 721, 729-30, 366 N.E.2d 528.) The potential for prejudicial inferences to be drawn from such a weapon in evidence far exceeds any legitimate purpose identified by the State in the present case and must be condemned. We also note the contribution to this error made by the defense, however, in not only failing to object to the many questions concerning the .357 Colt, when it knew beforehand the weapon's lack of connection to the murder, but also defense efforts to cross-examine the witness as to the weapon which, when unsuccessful, led to defendant's eventual motion for mistrial. It is only by reason of the strength of other evidence submitted in prosecution of defendant pointing to his guilt, however, that we now hold that his conviction must stand.

Any prejudice which may have resulted from the admission of defendant's pistol was minimized by witnesses who were examined and cross-examined concerning this weapon at all times, making it clear to the jury that it could not have been the murder weapon. Defendant was convicted by overwhelming evidence which left no reasonable doubt as to his guilt. The .357 pistol did not contribute to his conviction under the foregoing circumstances. The error, therefore, does not require reversal. *People v. Rickard* (1981), 99 Ill. App. 3d

914, 918; *People v. Eng* (1985), 138 Ill. App. 3d 281, 288-89, 485 N.E.2d 1222.

## II

■ Defendant next asserts that he was not proved guilty beyond a reasonable doubt, challenging the guard's eyewitness identification of defendant as the assailant. The witness saw defendant from a vantage point 5 feet away, under well-lighted conditions, and saw him shooting, but did not actually see the victim being hit by these shots.

Defendant points to what he considers to be a number of defects in the guard's testimony. First, he identified the getaway car as a two-door rather than the four-door that it actually was. This error is inconsequential in view of the fact that the witness correctly identified the make, color and year of the car and his sergeant also saw the getaway car, and correctly identified it as a four-door. Next, defendant's complaint that the guard was unable to identify defendant's scarf as belonging to the offender at trial is also inconsequential, since the guard said that the scarf looked familiar but that he could not positively identify it because it had been largely covered by defendant's cap on the night of the shooting.

■ The absence of corroborating evidence is suggested by defendant. He notes the negative result of the gunshot residue test; however, the expert witness at trial noted that due to the time lapse between the shooting and the test, negative results would be expected. Defendant also asserts that the only blood found in the garage belonged to the victim and no fingerprints were discovered. Defendant's intended import of this claim is unclear. The victim did not kill himself. Defendant points to the fact that none of the victim's blood was found on him. This is in accord with and corroborates the witness' testimony that he saw no blood on the shooter. Also, the medical examiner testified that the wounds might not have spurted blood. None of the foregoing points undermine the eyewitness identification which was premised on three separate opportunities to observe defendant, each for a reasonable length of time in well-lighted areas, and at close range. Such identification is clearly sufficient to support defendant's conviction. *People v. Reed* (1980), 80 Ill. App. 3d 771, 777, 400 N.E.2d 688; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 1318.

## III

The extended-term sentence of 60 years imposed on defendant is claimed to be excessive in light of his employment, and his medical

and criminal history. He was continually employed. He has a hearing problem which requires the use of a hearing aid. His criminal history reveals a dismissed charge of marijuana possession and a traffic violation. Defendant insists that the single applicable aggravating factor is outweighed by the foregoing factors in mitigation.

■ The circuit court was persuaded to impose the 60-year sentence by the nature of a significant aggravating factor: the brutal and heinous nature of the murder. The State asserted and the evidence established that defendant was alone with his victim for 5 to 10 minutes; he watched the garage and waited for the opportunity of his choice; he shot his victim three times in different places as his victim tried to escape, disabling him with bullet wounds in the thigh, leg and arm and knife wounds in the other arm; he apparently pulled the victim out from· underneath a car under which he tried to escape, dragged him to the center of the garage, and stabbed him 13 times in the neck and chest and once in the back. The time between defendant's first shot until his departure was between 5 and 10 minutes of murderous, brutal and heinous assault. It was not the clean, quick killing that defendant attempts to characterize but, rather, a slow, toying and brutal killing.

It is noted that defendant has failed to include the photographic exhibits which would demonstrate the progression of the crime through the garage and the character of the wounds inflicted upon the victim. These factors appeared to influence the court in its imposition of a 60-year extended-term sentence. The circuit court, in imposing an extended-term sentence, must look at the whole of defendant's conduct. (*People v. Devine* (1981), 98 Ill. App. 3d 914, 925, 424 N.E.2d 823, *cert. denied* (1982), 458 U.S. 1109, 73 L. Ed. 2d 371, 102 S. Ct. 3490.) Here, the court examined all the facts of the case and the sentencing report, and determined that defendant's conduct was at a level of brutality and heinousness which warranted the severe punishment imposed. The court did not abuse its discretion and, accordingly, the sentence must be affirmed. *People v. Woods* (1984), 122 Ill. App. 3d 176, 183, 460 N.E.2d 880; *People v. Andrews* (1982), 105 Ill. App. 3d 1109, 1113-14, 435 N.E.2d 706, *appeal denied* (1982), 91 Ill. 2d 572; *People v. Devine* (1981), 98 Ill. App. 3d 914, 927.

IV

■ The final defense challenge on appeal is to the constitutionality of the extended-term statute. Defendant asserts that he was not alerted to the possibility of this sentence by the information which charged the murder and that the terms brutal and heinous are vague

and nebulous. Both assertions previously have been rejected. (*People v. Gray* (1979), 80 Ill. App. 3d 213, 219, 399 N.E.2d 206, *appeal denied* (1980), 79 Ill. 2d 633.) Defendant's contention that the extended-term provisions give rise to an uncharged offense of "aggravated murder" is groundless. He cites no authority for asserting that the specific range of potential sentences must be explicitly stated in the charging instrument. It is sufficient that the range of possible sentences can be determined from the charging instrument coupled with the sentencing statutes. Defendant's argument that the terms "brutal" and "heinous" are constitutionally vague and nebulous has been specifically rejected by Illinois and Federal courts. *People v. Andrews* (1982), 105 Ill. App. 3d 1109, 1113; *United States ex rel. Peeples v. Greer* (7th Cir. 1984), 739 F.2d 262, 263-64; see also *People v. La Pointe* (1982), 88 Ill. 2d 482, 499-501, 431 N.E.2d 344.

Accordingly, there is no merit in defendant's appeal in view of the record presented in this case. Therefore, we must affirm defendant's conviction and sentence.

Affirmed.

SCARIANO, P.J., and BILANDIC, J., concur.