# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Salcedo*, 2011 IL App (1st) 083148

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE SALCEDO, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-08-3148 |
| Filed | June 9, 2011 |
| Rehearing denied | August 30, 1022 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for first degree murder and aggravated discharge of a firearm, the appellate court had jurisdiction, even though defendant's notice of appeal was filed more than 30 days after sentencing, since the State participated in the hearing on defendant's untimely motion to reconsider without objection and defendant's notice of appeal was filed just a few days after the motion was denied, and defendant's convictions were upheld where the trial court complied with Supreme Court Rule 431(b) and gave the potential jurors an opportunity to indicate whether they understood the *Zehr* principles by asking if they had any "difficulty or quarrel" with those principles. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-25129; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Michael G. Soukup, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan Spellberg, Kathleen Warnick, and Emma Nowacki, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion. |
| | Justices Pucinski and Sterba concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant Jose Salcedo was found guilty of the first degree murder of Keith Thomas (720 ILCS 5/9-1(a) (West 2004)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2004)). The trial court sentenced defendant to 28 years in prison for first degree murder, an additional 25 years in prison for discharging a firearm causing death and a concurrent 10-year prison term for aggravated discharge of a firearm. On appeal, defendant asserts that (1) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007); (2) the trial court erroneously submitted an initial aggressor instruction to the jury; (3) the trial court improperly prohibited defendant from presenting evidence regarding the victim's prior act of aggression; and (4) trial counsel was ineffective for stipulating to the recovery of firearm-related evidence from defendant's home. We affirm.

¶ 2                           I. BACKGROUND

¶ 3      The unfortunate events that led to the death of Keith Thomas occurred as he was driving to pick up his mother at a Chicago Transit Authority (CTA) elevated train station in the late afternoon of September 28, 2005. As he drove north on Pulaski Road, Thomas was shot several times by defendant, who claimed that the victim had struck his motor vehicle at least once and then allegedly brandished a gun at defendant. Defendant fled the scene, but was apprehended several days later. A subsequent search of the victim and his automobile revealed no weapons, just his dead body with a cell phone in his lap. While it was undisputed that defendant was the individual who shot the victim, a major controversy at trial concerned whether the alleged vehicular collision contributed to the defendant's decision to shoot the victim, on the basis that he felt in fear for his life.

¶ 4      The State and the defendant obviously pursued diametrically opposing theories at trial. The State's theory was that on the day in question, the victim and defendant were both driving when the victim allegedly bumped into defendant's car and continued driving. As a result, defendant became angry, chased the victim and intentionally fired multiple shots into

-2-

the victim's car, resulting in his death. The State also argued that because defendant was the initial aggressor, he could not have acted in self-defense or the unreasonable belief that self-defense was warranted. Defendant testified he was driving with his three-year-old son when the victim intentionally struck defendant's car. Defense counsel argued that defendant, who had a heightened sense of fear for his safety because he had previously been shot, believed he saw a silver gun in the victim's hand and fired multiple shots at him. Counsel dealt with the absent weapon by arguing that the gun may have been removed from the car or that defendant mistakenly believed that the silver cell phone was a gun. Counsel asked the jury to find defendant not guilty based on self-defense or, alternatively, guilty of second degree murder based on an unreasonable belief that self-defense was warranted.

¶ 5        Michael Considine testified, in pertinent part, that at about 5:30 p.m. on September 28, 2005, he was on his way to pick up his mother from the CTA Orange Line train station when he stopped his car facing east at a red light at the intersection of 51st Street and Pulaski Road. He then heard multiple gunshots and looked in the direction of where the shots had been fired. He saw a white or grey car, which had been stopped facing north in the left turning lane, drift toward oncoming southbound traffic and stop at the curb. Next to the passenger side of that car was a red car, which continued to drive north at a high speed. Considine called 911 and looked inside the grey car but did not see a cell phone. He did not put the car in park and did not see anyone else put his or her hand inside the car. When the police arrived, Considine described the red car and its driver.

¶ 6        Officer John Svienty testified that on September 28, 2005, he and his partner were assigned to this investigation. When they arrived at 5054 South Pulaski Road at 5:45 p.m., Officer Svienty saw a grey car facing northwest in the southbound lanes and an unresponsive individual inside. The individual and his car had been shot and a grey cell phone was on his lap. Officer Svienty spoke to Considine, who relayed what he had seen and described the offender and his car. After looking at a photograph showing that the victim's gearshift was in park, Officer Svienty testified that he did not move the gearshift to park and did not know who did. He did not recover anything from the interior of the car.

¶ 7        Detective Roger Murphy testified that when he and his partner arrived at the scene at about 6:15 p.m. on the day in question, the weather was cold, rainy and windy. Detective Murphy saw the victim in a grey car and observed a cell phone on his lap. He also observed damage to the victim's car, specifically, scrapes on the front left bumper, bullet holes in the passenger side door and shattered glass. Detective Murphy also found fired cartridge cases from a semiautomatic handgun and spoke to Considine, who described the offender and his car, which was last seen going north on Pulaski Road.

¶ 8        Forensic investigator Donald Fanelli testified that when he arrived at the scene at about 7 p.m., he assisted with the recovery of firearm evidence, including .45-caliber bullets and cartridge cases. Upon being shown photographs of the scene, Detective Fanelli testified there were two lanes and an additional turning lane in each direction and that a grey cell phone was in the victim's lap. Detective Fanelli did not find a gun inside the victim's car.

¶ 9        Marie Slaga, the victim's mother, testified that on the day in question, the 19-year-old victim drove her in their grey or silver Chevrolet Malibu to the CTA Orange Line train

station at 51st and Pulaski Road to go to work. At 4:30 p.m., they spoke on the phone and arranged for him to pick her up from the same station at about 6:10 p.m. When Slaga arrived, she observed significant traffic, crime scene tape and police officers. She called the victim to tell him not to pick her up but could not reach him. When Slaga walked toward the police officers, she was told that someone had been shot and a grey car was involved. She then recognized her own car, which was at an angle facing north in the southbound lanes of Pulaski Road, and she learned from detectives that her son had been shot.

¶ 10    The parties stipulated to the testimony of several police officers, including Officer Alfonso Castillo, who would testify that he obtained a warrant to search defendant and his apartment regarding a separate investigation. As Officer Castillo and his partner were conducting surveillance outside the apartment on October 3, 2005, they saw defendant drive a maroon 2000 Chevrolet Impala out of his garage. The officers stopped him, recovered his apartment keys and seized his car. Inside the apartment, officers recovered a .45-caliber semiautomatic Ruger firearm, a magazine containing seven .45-caliber rounds of ammunition and an additional round in the chamber of the firearm. The officers recovered a second magazine loaded with six .45-caliber rounds of ammunition, a plastic firearm case and a 9-millimeter Davis Industries pistol, which had two 9-millimeter rounds in its chamber. The officers also recovered a box of .357 Magnum Winchester ammunition, a box of 9-millimeter Winchester ammunition and a box of .45-caliber Winchester ammunition. In addition, the officers recovered a bulletproof vest, defendant's 'identification cards" and additional pieces of identification showing defendant lived there. When the officers arrested defendant, they observed that his physical description and car matched the description of the person who shot the victim in this case. Officer Castillo also recalled that a .45-caliber gun was used in the shooting. As a result, he notified the appropriate detectives of defendant's arrest.

¶ 11    Detective John Murray testified that on October 3, 2005, he was assigned to this investigation. When he arrived at work the next day, he learned that defendant had been arrested the day before and was in the custody of a different division of the police station. Upon the request of Detective Szudarski and Detective Murray, defendant was released to their custody and placed in an interview room, where the detectives turned on a recording device. After the detectives took defendant to the restroom, he gave a statement. Detective Murray testified that he never told defendant what he should or should not say and that the detectives did not speak to him in the hallway to the restroom. During Detective Murray's testimony, defendant's statement was published for the jury.

¶ 12    The video shows that after advising defendant of his rights and giving him food, Detective Murray and Detective Szudarski escorted defendant to the restroom. When they returned a few minutes later, defendant told the detectives he was driving on Pulaski Road at about 54th Street after dropping his girlfriend off, when the victim moved behind defendant and hit him a "little bit." The victim then passed defendant on his right, apparently referring to defendant's passenger side. Defendant stated that the victim "didn't hit me hard but he bumped me." Defendant also stated that the victim cut in front of defendant's car and other cars. The two men did not know each other and no words were exchanged. At first, defendant stalled because he did not want to "deal with" the situation but he became angry because his "shorty" was in the car. Referring to the victim, defendant said, "he tried to get

-4-

away from me" and then entered the turn lane. Defendant stated that as a result, he "caught up" to the victim and shot him six times with a .45-caliber gun. Defendant further indicated he did not unload the entire clip because he did not want to kill the victim. After the shooting, defendant continued driving on Pulaski Road and went home. Toward the end of the video, defendant was asked if he wanted anything else. Defendant himself did not provide any additional details regarding the shooting at that time, but he raised a number of matters when he testified at trial. Detective Murray testified that after defendant made his statement, evidence technicians were directed to photograph and remove a section of bumper from both defendant's car and the victim's car.

¶ 13    The parties stipulated that forensic investigator Steven Strzepek would testify that he recovered the left front corner bumper of the victim's car and the right rear corner bumper of defendant's car. In addition, forensic scientist Scott Rochowicz testified that he was assigned to compare the sections of bumper taken from the two cars, but he did not see signs of possible paint transfer. Although the bumper from the maroon car had a white to light-grey colored smear, the smear contained an insufficient quantity to do a comparison. In addition, the victim's bumper was heavily scratched and stained but the stain was not maroon paint. Forensic scientist Leah Kane testified that fired bullets and cartridge cases recovered from the scene were fired from the .45-caliber Ruger firearm recovered from defendant's home. The parties further stipulated that Dr. Michelle Jorden would testify that the victim's autopsy revealed one entry gunshot wound to the back of the upper right arm and one entry wound to the upper right back. She opined that the victim died from multiple gunshot wounds in the manner of homicide. When the State rested its case, the trial court granted its motion *in limine* to prohibit defendant from presenting the statements of Sandy Carrillo, the victim's girlfriend, regarding the victim's alleged aggressive driving.

¶ 14    Defense counsel presented the testimony of Roberto Rodriguez, who testified that in 2005, he was employed by an auto repair shop which defendant frequented. Although Rodriguez could not remember the exact date, at some point near September 28, 2005, defendant brought his maroon or red car to Rodriguez for repairs. The car had sustained damage to the rear quarter panel of the passenger side. Rodriguez removed a dent from the bumper and buffed the car but did not paint it. Even after the repairs, there was still visible damage to the car. Because Rodriguez did the work "on the side," no paperwork was generated.

¶ 15    Defendant, who was 23 years old at the time of the incident, testified that on the evening in question, he and his son had been driving home after dropping off Verenise Vasquez, defendant's girlfriend, at Daley College. The weather was rainy and windy. Defendant was driving northbound on Pulaski Road when he saw a grey car behind him at about 54th Street. When defendant first saw the car, it swerved behind him and hit the back of his car. Defendant "heard the bumper crack" but felt the impact only "a little bit." Defendant, believing it was an accident, activated his right turn signal to pull over. As he did so, the grey car hit them from the right side of the car at the back quarter panel. Defendant began swerving but regained control of the car. At that point, defendant "knew it was intentional, on purpose," because the grey car's driver did not respond to defendant's signal to pull over and instead, hit his car a second time.

¶ 16    Defendant testified that as this was happening, he was frightened due to an incident which occurred in 2000, when a van hit the car that he and his sister were traveling in at about 28th Street and Pulaski Road and a person in the van subsequently pointed a gun at them. Defendant and his sister were able to escape and no shots were fired. Defendant also testified that about six years before trial, he was at 30th Street and South Komensky Avenue when he was shot three times. In addition, he owned a bulletproof vest because he was afraid of being shot again. He usually took the vest with him when he left home but was not wearing it during his encounter with the victim.

¶ 17    Defendant continued, testifying that the grey car then "cut me off by my right side" and went around defendant on his left side. Defendant did not pull over and call the police at that time because the incident happened very quickly. He did, however, remove his gun from his waistband, keeping the gun out of sight from other drivers. He held the gun in his right hand and drove with his left hand. In addition, defendant rolled down his window because the rain obstructed his view of the grey car. As he continued to drive forward in the same lane, he slowed down due to traffic and a red light at 53rd Street, rather than weaving in and out of traffic to catch up with the grey car. Defendant then saw the grey car, which was about two car lengths ahead of him in the left turn lane. As defendant was passing the grey car, he saw something grey in the driver's hand and believed it was a gun. Defendant then fired five or six shots "[r]eal fast" without aiming his gun. He was scared because "either it was him or me and I got my son in the back seat." Defendant also testified that the whole incident happened very quickly and he did not know how much time passed between the second impact and the time he fired his gun.

¶ 18    After the shooting, defendant was afraid and drove home, although not at a high speed. Defendant did not know the victim had died and was afraid the victim was going to shoot him. When defendant arrived at home, he put the gun away but did not contact the police because he was scared. Following the shooting, defendant's back bumper was pushed in on the passenger side, his quarter panel was "crunched up" and the dent was "[p]retty big." He had the dent repaired and the car buffed but did not have the car repainted.

¶ 19    Defendant testified that on October 3, 2005, the police came to the apartment where he lived with Vasquez and their sons to execute a search warrant. Defendant was taken into custody because of the two loaded weapons, ammunition and bulletproof vest recovered from his home. At the police station, defendant was interviewed twice by different police officers. When counsel asked what the officers had asked defendant during the first interview, he answered, "[t]hey were asking me about the drug case." On the day after defendant's arrest, he spoke to Detective Murray and Detective Szudarski. When the officers were transporting defendant to and from the restroom, they asked him what happened. Defendant testified that before he explained his account of events to the detectives, "[t]hey pretty much [told] me that somebody was ramming me and I was with my son." Defendant testified that although the detectives told him that he was scared and shot the victim six times because he was defending himself, it happened to be true. At some point, defendant learned that the victim had been killed in the shooting. Although defendant said in his statement that the victim bumped his car a "little bit," he was referring to the first collision. Defendant testified that the police did not let him talk, but, rather, they kept talking and telling him what happened.

¶ 20    Verenise Vasquez testified that on September 28, 2005, she lived with defendant and their two sons. When defendant drove Vasquez to class in her maroon Chevrolet Impala that evening, their three-year-old son was in the car and it was raining heavily. She did not see a .45-caliber firearm in the car.

¶ 21    Detective Murray testified in rebuttal that he did not suggest to defendant what happened on September 28, 2005. Following closing arguments, the jury was instructed on first degree murder, second degree murder based on an unreasonable belief that self-defense was warranted, self-defense and the limited availability of self-defense to an initial aggressor.

¶ 22                            II. JURISDICTION

¶ 23    As a threshold matter, we must determine whether this court has jurisdiction in light of the passage of more than 30 days between sentencing and the filing of both defendant's motion to reconsider his sentence and notice of appeal. Although this issue was not raised by the parties in their original briefs, they were afforded an opportunity to address this issue in a supplemental brief. See *People v. Gargani*, 371 Ill. App. 3d 729, 731 (2007) (the appellate court has an independent duty to ensure that it has proper jurisdiction and will consider jurisdictional issues even where neither party has raised them).

¶ 24    Pursuant to Illinois Supreme Court Rule 606(b) (eff. Sept. 1, 2006), a notice of appeal must be filed within 30 days after the entry of the final judgment being appealed from or within 30 days after the entry of an order disposing of a timely filed motion directed against the judgment. *People v. Gutman*, 401 Ill. App. 3d 199, 209 (2010), *appeal allowed*, 237 Ill. 2d 572 (2010); *People v. Lindmark*, 381 Ill. App. 3d 638, 651 (2008). In a criminal case, the sentence is the final judgment (*Gutman*, 401 Ill. App. 3d at 209) and a motion to reconsider a defendant's sentence must be filed within 30 days of sentencing (730 ILCS 5/5-8-1(c) (West 2008)). Thus, ordinarily, the trial court loses jurisdiction 30 days after the final judgment was entered unless a timely postjudgment motion has been filed. *People v. Gibson*, 403 Ill. App. 3d 942, 948 (2010).

¶ 25    Here, defendant was sentenced on September 15, 2008. As a result, he had until October 15, 2008, to either file a motion to reconsider his sentence, thereby extending the trial court's jurisdiction, or file a notice of appeal, thereby vesting this court with jurisdiction. Defendant did not, however, file his motion to reconsider until October 31, 2008, and did not file his notice of appeal until November 7, 2008. Neither filing was timely. Although the trial court denied defendant's motion on October 31, 2008, the trial court had lost jurisdiction by then. Defendant contends and the State concedes that despite the otherwise untimely filing of defendant's motion to reconsider, the trial court retained jurisdiction by granting defendant an extension of time in which to file his motion to reconsider. Without specifically deciding that the trial court would have the authority to take such an action, we find that the record does not support their position.

¶ 26    Following sentencing, the court entered a continuance to October 8, 2008. Defendant correctly asserts that on that date, defense counsel, Stephen Komie, filed a "motion for continuance due to engagement of counsel," in which he represented that he was engaged in an unrelated trial which would require three weeks to complete and prevented him from

appearing in court that day. Counsel also stated that he was the only attorney in his firm with knowledge of defendant's case and the ability to provide competent representation "at any evidentiary trial or hearing." In counsel's prayer for relief, he sought a continuance. Notably absent from this motion is any indication that the unrelated trial impacted his ability to file a motion to reconsider defendant's sentence or a request that counsel be given an extension of time to file such a motion. We also note that despite the motion's suggestion that only Komie had knowledge of defendant's case, it appears that attorney Eric Anderson also appeared on defendant's behalf and was present for the majority of the trial.

¶ 27    On the same date, Anderson appeared in court on Komie's behalf and stated, "we do still intend to file a motion to reconsider as well as have a hearing on that. And we have filed a motion to continue today due to an engagement of counsel." When the trial court asked how long Komie would be unavailable, Anderson represented that Komie would not be available until October 31, 2008. The court then stated, "[a]s far as 05-25129, it's continued for post-trial motions and sentencing." None of the legal banter at that hearing can reasonably be considered a request for, or a grant of, an extension of time until October 31, 2008, for defendant to file his motion to reconsider. The discussion reflects a mere request that the *hearing* on any timely filed motion would be continued until October 31, 2008. We note that at this hearing on October 8, 2008, defendant still had seven days to file a motion to reconsider. Thus, Anderson's indication that defendant still intended to file a motion to reconsider in no way places doubt on the clear meaning of that request. The State adds to defendant's argument that at the hearing on October 31, 2008, defense counsel stated, "Judge, you were kind enough to continued [*sic*] this for our motion to reconsider sentencing. We filed that with your Honor." Again, it would be an abuse of the English language to suggest that an extension of time to file a motion had been requested or granted.

¶ 28    Defendant alternatively argues that the trial court was revested with jurisdiction. Pursuant to the revestment doctrine, parties may revest a trial court with personal and subject matter jurisdiction more than 30 days following a final judgment where they actively participate in proceedings which are inconsistent with the merits of the prior judgment. *People v. Bannister*, 236 Ill. 2d 1, 10 (2009). A party's conduct may be inconsistent with the prior judgment where the conduct can reasonably be construed as an indication that the parties do not view the prior judgment as final and binding. *Gibson*, 403 Ill. App. 3d at 948; *Gutman*, 401 Ill. App. 3d at 210. It is active participation, rather than mere consent, that revests jurisdiction. *Gargani*, 371 Ill. App. 3d at 731; *People v. Minniti*, 373 Ill. App. 3d 55, 66 (2007). If the trial court is revested with jurisdiction, the appellate court will be vested with jurisdiction by the filing of a notice of appeal within 30 days after the ruling on the untimely postjudgment motion. *Gutman*, 401 Ill. App. 3d at 210; *Lindmark*, 381 Ill. App. 3d at 652.

¶ 29    Here, at the hearing on October 31, 2008, the State did not merely consent to the proceedings but, rather, argued why defendant's motion should be denied on its merits. This was inconsistent with the finality of the prior judgment. See *Gibson*, 403 Ill. App. 3d at 948 (rejecting the State's assertion that revestment did not apply where it simply maintained its original position that the sentence was proper and holding that if the State had wished to take a position consistent with the prior judgment, it should have objected to any proceedings as being untimely); see also *Minniti*, 373 Ill. App. 3d at 66. By participating rather than

objecting to the hearing, the State essentially acknowledged that the previous sentencing judgment should be revisited. See *Lindmark*, 381 Ill. App. 3d at 652. We decline the State's request to depart from this court's prior cases finding such conduct to be sufficient for revestment. Furthermore, we disagree with the State's contention that our supreme court's opinion in *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539-40 (1984), requires that *both* parties specifically seek to set aside the judgment and retry the case in order for the revestment doctrine to apply. We find nothing in that case requiring that both parties overtly seek to set aside the judgment but, rather, find the opinion to be consistent with this court's cases finding that revestment may apply where one party challenges the prior judgment and the other party conducts itself in a manner which is inconsistent with acknowledging the final and binding nature of that judgment. Accordingly, because the trial court was revested with jurisdiction on October 31, 2008, defendant's notice of appeal filed on November 7, 2008, was timely and we have jurisdiction to consider his appeal.

¶ 30                          III. SUPREME COURT RULE 431(b)

¶ 31        On appeal, defendant first asserts the trial court failed to ensure that jurors understood certain principles as required by Supreme Court Rule 431(b). Initially, the State contends defendant forfeited this issue by failing to object and include this issue in a posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-13 (2010). Defendant argues that even if this issue was forfeited, the court's lack of compliance constituted plain error. Pursuant to the plain error doctrine, we will review an unpreserved error where (1) the evidence is closely balanced, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Davis*, 405 Ill. App. 3d 585, 590 (2010). Plain error analysis requires however, that we first determine whether any error occurred at all. *Thompson*, 238 Ill. 2d at 613. We find no error.

¶ 32        Rule 431(b) codified our supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472 (1984), which held that the trial court erred by refusing the defendant's request to ask the venire about four fundamental principles of law. *Zehr*, 103 Ill. 2d at 47-78. The four *Zehr* principles are as follows: (1) the defendant is presumed innocent; (2) the defendant must be proved guilty beyond a reasonable doubt; (3) the defendant is not required to produce any evidence; and (4) the defendant's failure to testify cannot be held against him. *Zehr*, 103 Ill. 2d at 477. According to Rule 431(b), the trial court must address the *Zehr* principles and "shall ask each potential juror, individually or in a group, whether that juror understands and accepts" those principles. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). In addition, "[t]he court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007). No magic words are required to satisfy the mandate of Rule 431(b). *People v. Ingram*, 409 Ill. App. 3d 1, 12 (2011).

¶ 33        Defendant does not dispute that the court conveyed the requisite principles to the jury but contends that it was insufficient for the court to ask jurors whether they had any "difficulty or quarrel" with those principles. Specifically, defendant contends that such language did not give the jurors an opportunity to indicate whether they understood the principles. This court

has previously held it was sufficient for the trial court to ask whether the jury had "any difficulty or quarrel" with the *Zehr* principles. *Ingram*, 409 Ill. App. 3d at 12; see also *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2010) (asking jurors whether they had "difficulties" with the propositions was another way of asking whether they understood). We find that any juror who did not understand one of the *Zehr* principles would have answered that he was experiencing "difficulty," a word which would certainly encompass a lack of understanding. Accordingly, we find no error.

¶ 34                                    IV. INITIAL AGGRESSOR INSTRUCTION

¶ 35        Defendant next asserts the trial court committed reversible error by giving the jury the initial aggressor instruction because it was unsupported by the evidence and it harmed him by permitting the jury to find he was required to retreat instead of continuing to drive in the same direction, thereby foreclosing his claim of self-defense. See *In re T.W.*, 381 Ill. App. 3d 603, 613 (2008) (a person who is not the initial aggressor does not have a duty to retreat); *People v. Ellis*, 107 Ill. App. 3d 603, 614 (1982) ("an initial aggressor must retreat before he regains the privilege to use force"). Initially, we reject defendant's assertion that our standard of review is *de novo*. Because defendant contends that no initial aggressor instruction should have been given, rather than asserting that the instruction given was inaccurate, we review the trial court's decision for an abuse of discretion. See *People v. Hammonds*, 399 Ill. App. 3d 927, 938 (2010) (we review the trial court's decision that an instruction applies to a case and thus, should be submitted to the jury, for an abuse of discretion; however, we review *de novo* whether the applicable law was accurately conveyed).

¶ 36        At trial, the jury was instructed on defendant's theory that he acted in self-defense (720 ILCS 5/7-1 (West 2004)) and was also instructed on his theory that he acted in the unreasonable belief that self-defense was justified, warranting a conviction for second degree murder (720 ILCS 5/9-2(a)(2) (West 2004)). As a counterpart, the jury also received the following initial aggressor instruction:

> "A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

See Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (4th ed. 2000).

¶ 37        The State and the defendant are both entitled to have the jury presented with instructions as to their theories of the case, and even very slight evidence regarding a theory justifies an instruction. *People v. Floyd*, 262 Ill. App. 3d 49, 55 (1994). An initial aggressor instruction is warranted by the evidence when the State presents evidence showing the defendant to be the aggressor or, where the case involves a question of whether he was the aggressor. *People v. Brown*, 406 Ill. App. 3d 1068, 1079 (2011). When the jury is given the initial aggressor instruction along with instructions pertaining to the justifiable use of force, the jury may resolve the evidence pursuant to either hypothesis. *Floyd*, 262 Ill. App. 3d at 56. Thus, submitting such an instruction to the jury does not erroneously assume that the defendant was

in fact the initial aggressor (*Floyd*, 262 Ill. App. 3d at 56) but, rather, permits the jury to identify the initial aggressor (*People v. Toney*, 337 Ill. App. 3d 122, 138 (2003)).

¶ 38    Defendant argues the evidence clearly showed that the victim was the aggressor because defendant testified that the victim intentionally struck defendant's car, disregarded his use of a turn signal as an indication to pull to the side of the road and, instead, struck his car a second time. The jury was entitled to reject such testimony, particularly because defendant's prior statement referred to only one minor collision. Notwithstanding defendant's prior statement, the severity of the resulting damage was also in question at trial. At a minimum, the jury could have found that despite defendant's conclusion that the victim was acting intentionally, his behavior indicated he accidentally hit defendant's car. Not only was the jury entitled to reject defendant's testimony regarding the collisions, but it was also entitled to find that the victim ended any such aggressive encounter when, according to defendant's own testimony, the victim subsequently passed defendant and continued driving. See *People v. De Oca*, 238 Ill. App. 3d 362, 368 (1992) (the trier of fact was entitled to find that the defendant was the initial aggressor where evidence indicated the prior fistfight had already ended and the situation transformed into a different encounter when defendant displayed a gun). Although defendant contends that there was no significant break in time after the collisions based on his testimony that the incident happened very quickly, the State contends that it did not happen quickly because it occurred over the span of a few blocks. The duration of the incident was clearly in dispute and it was for the jury to decide whether the initial encounter ended. More importantly, the jury was entitled to find that defendant became the aggressor. See *People v. Heaton*, 256 Ill. App. 3d 251, 257 (1994) (a nonaggressor has a duty not to become the aggressor). In light of defendant's statement to the police, the jury could find that he was angry and "caught up" to the victim in an aggressive manner while displaying a gun. See *Brown*, 406 Ill. App. 3d at 1079 (the right of self-defense will not justify killing the original aggressor either for the purpose of retaliation or where the original aggressor has abandoned the confrontation); *De Oca*, 238 Ill. App. 3d at 367 (a defendant may become the initial aggressor by pointing a loaded gun). The jury was not required to believe defendant's testimony that his gun was not visible to other drivers.

¶ 39    Defendant further contends that for the initial aggressor instruction to apply, three steps must be reflected in the evidence: (1) the defendant first acts in an aggressive manner; (2) the victim then uses force against the defendant; and (3) the defendant uses additional force against the victim. Defendant argues that because the instruction requires two aggressive acts by a defendant and here, the evidence presented at trial supports only one such act, *i.e.*, defendant's shooting of the victim, the initial aggressor instruction is inapplicable. Defendant's position is refuted by the record. As stated, the jury could find that defendant's conduct in displaying a weapon before he "caught up" to the victim was an act of aggression. Thus, the trial court properly submitted the initial aggressor instruction to the jury.

¶ 40              V. VICTIM'S PRIOR ACT OF AGGRESSION

¶ 41    Defendant further asserts that the trial court erred by prohibiting him from presenting the

-11-

testimony of Sandy Carrillo, the victim's girlfriend, who would testify to a prior incident in which she and the victim were having an argument when the victim intentionally drove into another car because he was angry, relying on *People v. Lynch*, 104 Ill. 2d 194 (1984). It is within the trial court's discretion to determine whether such evidence is admissible and relevant and a trial court's decision in this regard will not be reversed absent a clear abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). We find no abuse of discretion here.

¶ 42    Pursuant to *Lynch*, when self-defense is properly raised, the defendant may offer evidence of the victim's aggressive and violent character for two purposes, the first of which is to demonstrate the defendant's knowledge of the victim's tendencies that affected both his perception and reaction to the victim's behavior. *People v. Figueroa*, 381 Ill. App. 3d 828, 841 (2008). The second purpose, however, is implicated where there are conflicting accounts regarding who was the initial aggressor so that evidence of the victim's propensity for aggressiveness and violence may be admissible to support the defendant's account of events. *People v. Dennis*, 373 Ill. App. 3d 30, 52 (2007) (citing *Lynch*, 104 Ill. 2d at 200). The first purpose requires that the defendant knew of the victim's violent nature, whereas the defendant's knowledge is irrelevant for the second purpose. *People v. Nunn*, 357 Ill. App. 3d 625, 631 (2005). In addition, evidence of the victim's aggressive and violent character may affect a jury's credibility assessment of the varying versions of the facts and a defendant is entitled to have the jury assess the reasonableness of his behavior in light of all relevant facts. *Lynch*, 104 Ill. 2d at 199-200. Where accounts of an incident are conflicting or incomplete, the jury needs all available evidence to determine what really happened. *Nunn*, 357 Ill. App. 3d at 632 (citing *Lynch*, 104 Ill. 2d at 200).

¶ 43    The State contends that despite the trial court's decision to submit a self-defense instruction to the jury, there was no evidence of self-defense presented at trial and, thus, *Lynch* does not apply. Nonetheless, even assuming the jury was properly instructed on self-defense, we find Carrillo's testimony was not relevant to the purposes of *Lynch*.

¶ 44    During trial, the State filed a motion *in limine* to prohibit defendant from presenting Carrillo's statements regarding the victim's "bad character." Attached to the motion was an "Investigative Memorandum" from defense counsel's private investigator, Paul Ciolino. The memorandum contained statements made by Carrillo during an interview with Ciolino. According to the memorandum, Carrillo stated, in pertinent part, that the victim was "an aggressive driver who has received numerous speeding tickets and had been involved in at least two traffic accidents." Regarding the second collision, Carrillo indicated that near the time of the shooting, she and the victim were having an altercation and that "[w]hile they were having this altercation Thomas intentionally struck one of her neighbors car with his car." Carrillo stated that he did so because he was mad at her.

¶ 45    When the State brought this motion to the trial court's attention, it argued that Carrillo was not with the victim at the time of the shooting, that her statements about the victim's driving record and personal life were irrelevant to this case and that "[t]here are hearsay statements." The State represented that even though the memo referred to "an accident," it did not state that Carrillo witnessed it, but the memo specifically states that the second intentional collision happened "[w]hile they were having this altercation," indicating to us

-12-

that Carrillo was indeed present. The State further argued that defense counsel was improperly attempting to introduce "bad character" evidence. Defense counsel confirmed that he intended to present Carrillo's testimony and made an offer of proof that if called, Carrillo would testify that she and the victim lived together, had a child together and that the victim had a flash temper. According to defense counsel, "she would be able to testify to episodes involving automobile[s] driven by the decedent where he slammed them into automobiles of others just because he was mad. For no other explanation, just being angry about something." Defense counsel also stated that Carrillo had personal knowledge of and had witnessed such conduct. Counsel further stated that he would be calling Carrillo to establish the victim's driving habits, rather than to show his bad character, and that her testimony was relevant.

¶ 46    Following the parties' arguments, the trial court granted the State's motion, finding that Carrillo's testimony was "basically irrelevant on some occasions and, second of all, probative value, and I use the term very loosely, if any, is far outweighed the prejudicial effect in this case. Keith Thomas is not the person on trial. The fact that he might have been a bad driver on other occasions is not relevant to this case before me."

¶ 47    Because defendant did not know the victim at the time of the shooting, let alone know of any prior act of aggression, the first *Lynch* purpose does not apply here. We also find, however, that the second purpose of *Lynch* would not have been furthered by submitting this evidence to the jury. Defendant correctly contends that defense counsel's offer of proof, as corroborated by the investigative memo, showed Carrillo would testify that the victim intentionally, rather than accidentally, drove into a neighbor's car out of anger. Defendant's attempt to bootstrap this thin narrative into a tale of road rage run amok must fail, however, because neither defense counsel's statements to the court nor the investigative memo indicated that the neighbor's car was occupied, that the incident occurred on a roadway or that the victim was otherwise attempting to injure a motorist in the prior incident. An individual's tendency to exercise aggression against an inanimate object such as a parked car does not inherently increase the likelihood that the individual would exercise aggression against another person. Even assuming the victim had previously driven into a parked car because he was mad at Carrillo, this does not make it more probable that the victim deliberately drove into defendant's moving vehicle, after having dropped his mother off at the Orange Line. *Morgan*, 197 Ill. 2d at 455-56 (evidence is relevant if it has any tendency to make the existence of a fact which is of consequence to the determination of an action more or less probable than it would be without such evidence). The fact that the victim hit a parked car out of anger with his girlfriend does not even remotely tend to prove that he was aggressively driving his vehicle in a manner to threaten and/or injure defendant. In this regard, defendant leans on a rather slender reed. Accordingly, the trial court properly found Carrillo's testimony was irrelevant and did not abuse its discretion by not allowing the jury to hear the details of the victim's prior driving issues.

¶ 48    Even assuming error occurred, we find such error was harmless for the same reason. We do not believe the victim's alleged use of force against an unoccupied car would affect a determination by the jury that the victim did not intentionally strike defendant's car and thus, was not the aggressor. See *People v. Bass*, 351 Ill. App. 3d 1064, 1069 (2004) (the State

carries the burden of proving the jury verdict would have been the same in the absence of the error); *People v. Bowens*, 407 Ill. App. 3d 1094, 1104-05 (2011) (an error is harmless when it appears beyond a reasonable doubt that it did not contribute to the verdict).

¶ 49                           VI. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 50    Finally, defendant asserts trial counsel was ineffective because he stipulated that the police executed a warrant to search defendant and his apartment regarding an unrelated investigation and located firearms, ammunition and a bulletproof vest which were unrelated to the present offense. To show that counsel was ineffective, a defendant must demonstrate both that counsel's performance was deficient and that, as a result, the defendant was prejudiced. *People v. Bailey*, 232 Ill. 2d 285, 289 (2009) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). The failure to satisfy either prong precludes finding that counsel was ineffective. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Under the first requirement, there is a strong presumption that trial counsel's action or inaction resulted from sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To overcome this presumption, a defendant must show that trial counsel's action was so irrational and unreasonable that no reasonably effective attorney would pursue that strategy under similar circumstances. *People v. Mabry*, 398 Ill. App. 3d 745, 751 (2010). In addition, trial counsel's strategic decisions are virtually unchallengeable. *People v. Weatherspoon*, 394 Ill. App. 3d 839, 848 (2009). In deciding whether defense counsel's performance was deficient, the court must consider counsel's conduct from his perspective at trial and must avoid using hindsight. *Bailey*, 232 Ill. 2d at 296. To show prejudice, a defendant must demonstrate a reasonable probability exists that but for counsel's error, the result of proceedings would have been different. *People v. Harris*, 389 Ill. App. 3d 107, 132 (2009). Furthermore, the mere use of a stipulation does not demonstrate ineffective assistance of counsel. *People v. Smith*, 326 Ill. App. 3d 831, 851 (2001).

¶ 51    Defendant does not dispute it was relevant to the State's case that the police found inside defendant's home the .45-caliber gun used to shoot the victim. As a result, the police could explain how they came to be inside defendant's home and there would be no basis here for defense counsel to object to evidence that the police had a search warrant regarding an unrelated investigation. See *People v. Garmon*, 394 Ill. App. 3d 977, 989 (2009) (a police officer may explain the steps taken in investigating a crime and may describe the events which led to the accused's arrest where necessary to explain the State's case).

¶ 52    We also find defense counsel stipulated to the remainder of firearm-related evidence that was not connected to this offense as a matter of trial strategy. At trial, counsel presented alternative theories of self-defense and second degree murder based on an unreasonable belief that self-defense was warranted. In support of the latter theory, counsel argued that defendant had a heightened sense of fear due to prior incidents in which he was the victim. Contrary to defendant's suggestion, a jury could find evidence that defendant had two guns, a significant amount of ammunition and a bulletproof vest corroborated the theory that he was more fearful and protective than the average person. That defendant was not wearing the vest on the day in question does not change the result. Thus, we reject defendant's contention

that such evidence had no bearing on his belief at the time of the shooting. In addition, defendant argues evidence that the victim struck his car, that defendant believed he saw a gun in the victim's hand and that defendant had previously been victimized was sufficient to support counsel's theory. Defendant ignores, however, that such evidence came exclusively from his own uncorroborated and self-serving testimony. We find it was entirely reasonable for counsel to present additional corroborating evidence.

¶ 53        Defendant also argues this strategy was unsound in light of case law limiting the State's use of weapons evidence and cases discussing the danger of prejudice in admitting weapons which are unrelated to the crime charged. See *People v. Evans*, 373 Ill. App. 3d 948, 960 (2007) (a weapon may not generally be admitted into evidence unless there is evidence connecting it to the defendant and the crime or unless the weapon was in the defendant's possession when arrested for the crime); *People v. Jackson*, 154 Ill. App. 3d 241, 246 (1987) ("[t]he potential for prejudicial inferences to be drawn from such a weapon in evidence far exceeds any legitimate purpose identified by the State in the present case and must be condemned"); *People v. Smith*, 413 Ill. 218, 223 (1952) (where the State failed to connect weapons evidence to the crime committed, court held "the admission of shotguns in evidence was improper" and "could only serve to arouse the jury and prejudice the defendant's position"). Notably, none of those cases involved a defense attorney's deliberate decision to stipulate to weapons evidence in support of a defense. Defendant contends that "[m]erely because there are no published cases where counsel failed to object to evidence that was introduced through stipulation does not diminish the fact that it was unsound for counsel to do so." Although our own research has not revealed any cases involving a similar strategy by defense counsel, we find this strategy to be sound where, as here, it was probative evidence toward a defense which otherwise relied exclusively on defendant's testimony. We will not engage in hindsight to find counsel was deficient merely because his strategy did not result in the verdict defendant desired.

¶ 54        Furthermore, the record refutes defendant's assertion that counsel failed to connect the challenged evidence to the defense's theory. As defendant acknowledges, counsel specifically asked defendant why he owned a bulletproof vest and defendant answered that he wanted protection because he had previously been shot. Defendant also testified that he usually took the vest with him when he left the house. In addition, counsel argued at length in closing that prior incidents in which defendant was the victim had rendered him more fearful and protective than the average person, as corroborated by the items found in his home. Specifically, counsel argued as follows:

> "I fell off a horse into a cactus once. I got two hundred needles in me. My parents, after I walked into town like this (indicating) because I couldn't ride the horse anymore with the cactus, I walked in town and the doctor pulled the needles out. I never wanted to get back on a horse, but my parents told me I had to. When I got back up on the horse the next time, I wore chaps on my legs, a leather vest to make sure if I ever got tossed off in the cactus again I would be protected.
>
> So a man who had been shot would become more sensitive to injury than the ordinary person. A man who had been shot three times and lay in Mount Sinai Hospital down the street here to get better would be more sensitive and more

concerned about protecting himself than the ordinary guy who had never been shot at.

So it's not surprising he's got a bulletproof vest. It is not surprising he has a 45. It is not surprising that when he looked out that window on that day and saw something in somebody's hand and it looked silver, looked metallic, it looked like a weapon to him, that he reacted the way he did."

This engaging anecdote was surely designed to persuade the jury that defendant came by his disputatious temperament because of his earlier traumas. Counsel's argument was also designed to connect defendant's earlier traumas to his heightened sense of fear, as corroborated by the items found in his home. Although counsel did not specifically refer during closing arguments to the firearm and ammunition which were unrelated to this crime, the jury would clearly understand counsel's argument to apply to such items. This type of advocacy does not establish ineffective assistance of counsel; it points out defense counsel went to great lengths in an effort to convince the jury that defendant's actions were consistent with self-defense or at least consistent with second degree murder. That he failed in this effort is no basis for criticism on appeal.

¶ 55 Finally, to the extent defendant argues that the evidence was improperly introduced through the State's case rather than defendant's case, it would make little sense to challenge the evidence as irrelevant and prejudicial in the State's case and subsequently seek its admission because it would be relevant and probative to the defense. Even if the stipulation potentially benefitted both parties, that fact did not render counsel's conduct unreasonable. The stipulation may have indicated to the jury that defendant did not find such evidence to be harmful to his case, as opposed to a concession in favor of the State. Under these circumstances, defense counsel's use of a sound trial strategy to support defendant's otherwise uncorroborated testimony was not deficient. Accordingly, defendant has failed to demonstrate that counsel was ineffective.

¶ 56 For the foregoing reasons, we affirm the judgment.

¶ 57 Affirmed.