(No. 53208.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT TAYLOR, Appellant.

*Opinion filed April 4, 1984.—Rehearing denied June 4, 1984.*

510

UNDERWOOD, J., RYAN, C.J., and MORAN, J., dissenting.

Robert Agostinelli, Deputy Defender, and Verlin R.F. Meinz and Charles W. Hoffman, Assistant Defenders, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein and Mark Rotert, Assistant Attorneys General, and Michael E. Shabat, Lawrence R. Stasica and Joan S. Cherry, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County defendant, Robert Taylor, was convicted of the murder and armed robbery of Freddie Lampton. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) the People requested a death sentence hearing. Defendant waived his right to a jury at the sentencing hearing, and the court sentenced defendant to death for the murder conviction and to an extended term of 60 years' imprisonment for the armed-robbery conviction. Defendant has appealed both convictions and sentences. Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603.

Ronald Howell testified that on March 7, 1979, at approximately 9 p.m., he and Romy Wright were in an elevator at the Cabrini Green apartment complex. He stated that, when the elevator was at the fifth floor and

descending, he heard two shots. Howell and Wright left the elevator at the lobby level, where Howell saw two acquaintances, Cynthia Cobb and Steve Davis, standing in the lobby near a stairway. Howell testified that Cobb was screaming and when he approached her he saw the body of Freddie Lampton lying near the stairs. Howell asked Davis to call the police and advised the hysterical Cobb to leave the area. He testified that after Davis and Cobb left he saw defendant "come down from somewhere," and bend over Lampton's body. It looked to Howell as though defendant removed Lampton's watch, but he could not testify to that fact with certainty. It also appeared to him that defendant took something from Lampton's pocket. According to Howell's testimony defendant then stood up and pointed a "big silver" gun at him telling him not to move. At that point Howell ran out of the building. He reported the incident to the police the following day. Although he stated that he saw defendant's face only briefly, on March 13, 1979, Howell pointed defendant out in a lineup, and his in-court identification was unequivocal.

Cobb, called as a witness by defendant, testified that on March 7, 1979, at approximately 9 p.m., she was in the lobby of a Cabrini Green apartment building when she heard two men arguing and then two gunshots. After hearing the shots Cobb ran out of the building but returned a few minutes later. She stated that as she was returning she saw an unidentified man, with his hands in his pockets, walking quickly out of the building. Upon her reentering the building she observed Lampton's body lying near the stairs and Davis and Howell standing in the lobby. Neither Romy Wright nor Steve Davis testified.

When the police arrived on the scene shortly after 9 p.m., Lampton was dead. The police discovered a spent bullet near the body and another was later recovered in

his clothing. Subsequent tests indicated that Lampton's death was caused by the bullet wounds and that he was intoxicated at the time of his death. Except for a piece of paper, no personal belongings were found on the body.

Virginia Lampton, the deceased's widow, testified that her husband owned a wallet and watch, and that she last saw those items on March 6, 1979. She further testified that her husband was usually paid on Wednesdays. Charles Smilgys, the comptroller for the deceased's employer, testified that a payroll check in the amount of $286.88 was issued to Freddie Lampton on Wednesday, March 7, 1979, and that funds were paid out on the check that day. Virginia Lampton identified the endorsement on the check as her husband's signature.

Chicago police officer Joseph Sparks testified that at 8 p.m. on March 9, 1979, he responded to a radio report of gunshots. After parking his squad car near the scene of the reported shots, Officer Sparks testified that he observed a yellow van pull up behind him, that the van backed into a car behind it, and that two men then fled from the van. Following a short chase, the men were apprehended, and Officer Sparks identified one of them as defendant. The officer placed defendant under arrest and seized from him a gun and $158.

James Gainer, a firearms expert for the Chicago police department, testified that the bullets recovered by the police when Lampton was found dead could only have been fired from the gun that was taken from defendant at the time of his arrest.

Over defendant's objection, Mary Shropshire, an assistant State's Attorney, testified that on March 10, 1979, after advising him of his *Miranda* rights, she questioned defendant. Defendant told her that he had acquired the gun a week earlier in exchange for narcotics. Defendant also stated that he had exclusive possession of the gun that week, and that he had not been to Ca-

brini Green since 1973.

The People also introduced evidence of an attempted armed robbery committed by defendant on March 5, 1979, and an armed robbery he committed on March 9, 1979. Regarding the first incident, Shirley Christmas testified that defendant approached her car and pointed a "long silver" gun at her. Defendant ordered Christmas to open her car door and demanded money from her. After searching Christmas, defendant unsuccessfully attempted to start her car and threatened to take her with him. As to the second offense, Theophilus Hunt testified that the defendant approached his van, posed as a policeman and pointed a "nickel plated" gun at his head. Defendant ordered Hunt out of the van, searched him, and took the keys to the van and $9.

Defendant's first argument on appeal is that his armed-robbery conviction should be reversed because the State failed to prove beyond a reasonable doubt a forcible taking of property. A conviction of robbery requires proof that the accused took property from the person or presence of another by the use of force or by threatening the imminent use of force. (Ill. Rev. Stat. 1979, ch. 38, par. 18—1.) Although defendant concedes that armed robbery may be proved by circumstantial evidence (*People v. Susanec* (1947), 398 Ill. 507, 513), he notes that the People's eyewitness, Ronald Howell, admitted on cross-examination that he did not actually see defendant take anything from Lampton's body. Defendant also maintains that there was insufficient proof that Lampton had personal property in his possession immediately before the incident. It is suggested that the reason defendant bent over Lampton's body could have been to determine whether Lampton was alive or to retrieve something defendant had lost earlier. Regarding the absence of Lampton's personal belongings, defendant asserts that, since Lampton was intoxicated, he could have

spent all of his money earlier that day and given away or lost his watch and wallet.

Citing *People v. Susanec* (1947), 398 Ill. 507, the People argue that a conviction for armed robbery will be sustained on circumstantial evidence where the evidence is of a strong and convincing character so as to satisfy the trier of fact as to the defendant's guilt beyond a reasonable doubt.

We are of the opinion that there was not sufficient evidence to sustain the conviction for armed robbery. Howell testified:

> "I was standing here by the janitor door [indicating on diagram] and the young man there came down from somewhere and he bend over the body. I don't know what he was doing, but I couldn't see what he was doing. I think he took a watch, took something off him and then he unzipped his coat and pulled up a shiny gun, and that's when I ran."

Here, there is no evidence that the deceased was possessed of money or a watch when he entered the premises, and the testimony of Howell offers little support for the theory that anything was taken from him.

In *People v. Ohle* (1951), 408 Ill. 238, 242-43, the court said:

> "While the taking of property from the person of another can be proved by circumstantial evidence [citation] in order to sustain a conviction based upon circumstantial evidence, the evidence adduced must be of a conclusive nature and produce a reasonable and moral certainty that the offense charged was actually committed and that the accused and no one else perpetrated the crime."

The evidence here is inconclusive that a robbery was committed or that violence or fear of violence was the means utilized to take property from the victim. See *People v. Tiller* (1982), 94 Ill. 2d 303, 316.

Defendant contends next that statements made to Assistant State's Attorney Mary Shropshire were elicited in

violation of his *Miranda* rights and that therefore his motion to suppress those statements was improperly denied. Specifically, defendant asserts that, in their repeated efforts to procure information from him, the police failed to scrupulously honor his request to remain silent. The testimony at the suppression hearing established that from 8 p.m. on the evening of defendant's arrest until 2 a.m., three officers and an assistant State's Attorney, some of whom were accompanied by other officers, attempted to interview defendant at intervals approximating one to three hours apart. On each occasion defendant was given *Miranda* warnings and, although he did not request a lawyer, he indicated that he did not want to answer questions. At 4:50 p.m. the following afternoon, 15 hours after the last interview, defendant spoke with Assistant State's Attorney Philip Mitchell and, after being informed of his *Miranda* rights, indicated a willingness to answer questions. The record does not indicate that Mitchell continued to question defendant thereafter. Instead, Assistant State's Attorney Shropshire appeared some six hours later, again gave defendant the *Miranda* warnings, and defendant made the statements now in question. Defendant also contends that questioning concerning the admissibility of the statements made to Shropshire was improperly restricted at the suppression hearing.

The propriety of resuming interrogation of an accused after he has previously invoked his right to remain silent was addressed in *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321. The court decided that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (*Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) We note that defendant here was advised of his *Miranda* rights prior to each interrogation, that questioning gener-

ally ceased when defendant invoked his right to remain silent, and that significant periods of time elapsed between the earlier questioning and the interview in which defendant gave the statements, all of which were factors persuading the *Mosley* court that defendant's right to remain silent had been "scrupulously honored." We do not, however, consider resolution of that question necessary to our conclusion that admission of the statements was not reversible error. The statements were incriminating only in that defendant said that he acquired the gun a week earlier and that he had sole possession of it during that time. The primary value of such evidence to the People was that it tended to prove that defendant was in possession of the murder weapon at the time of the murder. That fact, however, was sufficiently established by the seizure of the gun at the time of defendant's arrest, the firearms expert's testimony that the gun seized was the murder weapon, and Howell's testimony that defendant was carrying the gun at the time of the murder. We are therefore convinced that the suppression of defendant's statements would have had no bearing on the court's findings, and that their admission was, at worst, harmless error beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

Defendant contends next that his convictions should be reversed because, in violation of the Code of Criminal Procedure of 1963, his motion for substitution of judges was ruled on by the judge named in the motion. Section 114—5(c) of the Code provided:

> "[A]ny defendant may move at any time for substitution of judge for cause, supported by affidavit. Upon the filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion." (Ill. Rev. Stat. 1979, ch. 38, par. 114—5(c)).

Defendant alleged in the motion that the trial judge would be prejudiced against him because the same judge had pre-

sided over two previous trials in which defendant was convicted. Despite defendant's awareness of these circumstances, he did not move for a substitution of judges until the court had already made rulings on motions to quash his arrest, suppress the statements made to Assistant State's Attorney Shropshire, and limit the use of evidence of other crimes.

This court has repeatedly stated that a motion to transfer a case to a new judge, due to the alleged prejudice of the assigned judge, must be made at the earliest practical moment after any potential prejudice is discovered. (*People v. King* (1973), 54 Ill. 2d 291, 297; *People v. Lawrence* (1963), 29 Ill. 2d 426, 428; *People v. Chambers* (1956), 9 Ill. 2d 83, 89.) The rule is clearly designed to prevent defendants "from first ascertaining the attitude of the trial judge on a hearing relating to some of the issues of the cause, and then, if the court's judgment is not in harmony with counsel's theory, to assert the prejudice of the court ***." (*People v. Chambers* (1956), 9 Ill. 2d 83, 89.) Thus, since defendant did not move for a substitution until the trial judge ruled on a number of substantive issues, his motion was untimely, and he cannot now complain of its denial. We add, too, that the fact that a judge has ruled against a defendant in a prior case is not alone sufficient reason to disqualify that judge from sitting in subsequent cases involving the same defendant. *People v. Vance* (1979), 76 Ill. 2d 171, 178.

Defendant's next argument is that his jury waiver at the guilt phase of the trial was invalid because it was based on a mistaken belief that some of the jurors had participated in his previous trials. He alleges that the court was aware of his misconception and that therefore its acceptance of his waiver constitutes reversible error.

The record indicates that selection of the jury in defendant's case commenced on January 10, at which time the jury was sworn to try the issues. Defendant was

present during questioning of the jurors, only one of whom stated that he had ever sat on any criminal case, and that had been some 10 or 12 years earlier. Following completion of the prosecution's opening statement, defendant stated he was waiving his right to counsel and wanted to personally address the jury. After admonishing defendant as to the consequences of his waiver, the court allowed defendant to proceed *pro se*. Defendant then stated he was waiving his right to a jury trial. At defendant's request, after the State had completed examination of its second witness, the court subsequently reappointed counsel. Defense counsel then sought a hearing on defendant's request to waive a jury, indicating he believed defendant had a right to waive a jury at any time during trial. The People indicated their belief that, after the jury was empaneled, allowance of the request was discretionary with the court. The court then postponed a ruling until Monday, January 14. Consequently, defendant had four days to discuss the matter with counsel and, indeed, counsel explained the implications of the jury waiver to defendant and vigorously advised against it. Before the waiver was accepted on the 14th, the trial judge again instructed defendant that he had a right to a jury and that he was still free to exercise that right. The court's admonition included an explanation of the charges against him, the possible sentences, and that the judge would decide defendant's guilt or innocence in the absence of a jury. Defendant stated that he understood the explanation and persisted in his waiver of a jury. We note in this connection that defendant had also waived a jury in one of his prior criminal trials. He stated during the sentencing hearing that: "[I]t was a jury trial in the beginning, but I waived the jury and we proceeded with a bench trial."

The parties agree that a valid jury waiver must be expressly and understandingly made. (Ill. Rev. Stat. 1979, ch. 38, par. 103—6; *People v. Surgeon* (1958), 15 Ill. 2d 236,

238.) Whether a waiver is understandingly made necessarily depends on the facts and circumstances in each particular case. *People v. Lewis* (1981), 88 Ill. 2d 429, 437-38; *People v. Richardson* (1965), 32 Ill. 2d 497, 499.

The record before us indicates defendant is an individual of some ability and education. He graduated from elementary and high school and, while in prison as a result of earlier convictions, received credits in English, political science and mathematics from Southern Illinois University. A job counselor for the Safer Foundation who had placed defendant in employment stated that defendant seemed to be very smart. He had no history of mental illness or retardation. He received competent guidance from counsel, was told both by counsel and the circuit court of the consequences of a jury waiver, and counsel advised against it. While defendant did indicate that the jurors included some of the same ones who had found him guilty in August 1979, we consider it highly unlikely that his waiver was the result of any such misconception. Defendant was present in the courtroom during the entire selection of the jurors, only one of whom stated that he had ever sat on a criminal case. In the context of this record we hold the waiver valid.

We consider next whether the circuit court erred in permitting the People to introduce evidence of defendant's other offenses of attempted armed robbery and armed robbery. While evidence of other crimes is generally admissible under a *modus operandi* theory to establish knowledge, identity, intent, motive, design or plan (*People v. Alexander* (1982), 93 Ill. 2d 73, 79; *People v. Tate* (1981), 87 Ill. 2d 134, 141), defendant argues that our decision in *Tate* requires that, before evidence of other crimes can be admitted, the People must make a strong and persuasive showing of similarity between the crime charged and the prior offenses. Here, it is urged, the Christmas and Hunt incidents were too dissimilar from the present case to satisfy

the *Tate* standard. Defendant notes that the earlier offenses took place outside, while the Lampton incident occurred inside a building. Also in contrast to the present case, in the Hunt incident defendant posed as a policeman and in the Christmas incident defendant entered the victim's car, attempted to start it, and threatened to take the victim with him.

While obviously some differences between the three cases do exist, we have never held in *Tate* or elsewhere that other crimes must be identical to the crime charged before evidence of them is admissible. (See *People v. Anderson* (1982), 108 Ill. App. 3d 563, 570.) Certainly some dissimilarity will always exist between independent crimes. There are, however, a number of substantial similarities between the three incidents here in that they all occurred within a one-block area and within a four-day period. Each occurred in the early evening hours, and in each, defendant was carrying what appeared to the witnesses to be the same gun. In all three cases defendant searched the victim, and defendant was identified as the perpetrator in each incident. These similarities tended to establish defendant's possession of the murder weapon, his intent to commit an armed robbery, his placement near the scene of the crime, and served to identify him as the murderer. Accordingly, we conclude that admission of evidence of the earlier crimes was not error.

We disagree, too, with defendant's assertion that the People's treatment of the prior convictions was overly extensive and prejudicial. The witnesses who testified simply detailed the facts relating to the offenses in order to establish the similarities between the offenses. In addition, we note that the circuit judge had presided in the Hunt and Christmas trials and was already familiar with the details of those cases which he, presumably, considered only for proper purposes. *People v. Berland* (1978), 74 Ill. 2d 286, 310.

Defendant alleges next that he was denied effective assistance of counsel, citing as support that counsel moved to withdraw from the case six times, that counsel was unprepared on several occasions due to defendant's attempts to proceed *pro se*, and that meaningful interaction with counsel was virtually nonexistent.

The record shows that counsel was appointed on May 14, 1979, and represented defendant throughout the pretrial proceedings. On September 5, defendant accused counsel of incompetence and, due to those allegations, counsel moved to withdraw. The court, apparently satisfied with counsel's performance, gave defendant the option of proceeding *pro se* or with counsel. Defendant continued with counsel, who represented him until November 6, at which point the court allowed defendant to waive his right to counsel, and ordered his attorney to represent defendant on a standby basis. Defendant appeared *pro se* on 11 separate occasions during November and December. He was told in November that the case was scheduled for trial on January 7, 1980, and the court strongly urged him to secure counsel and advised him that the trial date would not be extended. When defendant appeared on the day of trial without an attorney, the court reappointed his original counsel and stated:

> "I don't see any reason, any good legitimate reason at the 11th hour just before we proceed to trial, the defendant says he wants counsel appointed for him. I can understand under those circumstances an attorney finding himself in a situation when pressed to trial upon the matter being set for trial, has misgivings about going forward. However, I do not believe that the defendant has been denied any right at this juncture, and the defendant will not be placed in a position of deciding this court's trial schedule."

During jury selection defendant had demanded, contrary to counsel's advice, that 12 consecutive jurors be ex-

cused. Counsel moved to withdraw from the case due to defendant's conduct, and the motion was denied. Defendant then excused the next eight consecutive jurors, also against the advice of counsel, thereby exhausting his 20 peremptory challenges. Before defense counsel's opening statement, defendant asked to address the jury. When the court informed defendant that he could not make a statement to the jury while represented by counsel, defendant again decided to waive his right to counsel. As earlier noted, after the People examined two witnesses, defendant requested that counsel be reappointed, and the court did so despite counsel's desire to withdraw. When defendant decided to waive his right to a jury, contrary to counsel's strong objections, counsel again moved to withdraw and the motion was denied. When counsel was prepared to rest, defendant indicated his desire to call another witness. Counsel advised against it and defendant accused him of incompetence. Counsel again moved to withdraw. The court informed defendant that he could call the witness only if he proceeded *pro se* and denied counsel's motion to withdraw.

It is abundantly clear from the foregoing that any ineffectiveness on the part of counsel was attributable solely to the uncooperative and disruptive conduct of defendant. Defendant repeatedly interfered with counsel's efforts to represent him competently, and attempted to delay the proceedings on several occasions by asserting his inability to obtain counsel and his desire to waive counsel and appear *pro se*. An indigent defendant may not use his right to appointed counsel for the purpose of delaying trial or to impede the effective administration of justice. (*People v. Friedman* (1980), 79 Ill. 2d 341, 349.) Our system of criminal justice simply could not function were we to permit defendants, indigent or otherwise, to intentionally hamper counsel's efforts to represent them and later plead the resulting ineffectiveness of counsel as a grounds for reversal.

(*People v. Myles* (1981), 86 Ill. 2d 260, 270-71; *People v. Solomon* (1962), 24 Ill. 2d 586, 590.) Any shortcomings of counsel were the direct result of defendant's own misconduct, and he may not now seek benefits therefrom.

There is sufficient evidence to sustain defendant's conviction of murder and, indeed, no serious contention is made that the evidence fails to prove him guilty beyond a reasonable doubt. We find no error which warrants reversal of the conviction for murder, and the judgment of the circuit court is to that extent affirmed.

Defendant has briefed and argued a number of issues relevant to the sentencing hearing and the imposition of the death sentence. The aggravating factor upon which the death sentence was based was the armed robbery of the victim, and for the reasons stated herein, the conviction for armed robbery must be, and the same is hereby, reversed. In *People v. Walker* (1982), 91 Ill. 2d 502, this court held that the imposition of a death penalty based on the aggravating factor that the murder was committed in the course of one of the felonies enumerated in the statute "does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony ***." 91 Ill. 2d 502, 511.

"The death penalty statute does require the State to prove beyond a reasonable doubt (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(f)) the aggravating factor, that is, that the murder was committed 'in the course of' the armed robbery (or other specified felony). This is so whether the defendant has been convicted of armed robbery (or another specified felony), or of attempted armed robbery." (*People v. Walker* (1982), 91 Ill. 2d 502, 511.) Because we reversed the armed-robbery conviction for the reason that it was not supported by sufficient evidence, it follows that the death penalty must be vacated, and we need not consider the alleged errors in the sentencing hearing and in the imposition of sentence.

For the reasons stated, the portion of the judgment of the circuit court finding defendant guilty of armed robbery is reversed and that portion of the judgment finding defendant guilty of murder is affirmed. The sentences imposed are vacated and the cause is remanded to the circuit court of Cook County with directions to impose a sentence other than death for the murder conviction.

*Judgment affirmed in part and reversed in part and vacated in part; cause remanded, with directions.*

JUSTICE UNDERWOOD, dissenting in part:

I do not share my colleagues' opinion that the evidence was insufficient to support the armed-robbery conviction.

The majority complains that evidence of the robbery here was "inconclusive," but I know of no reviewing court which requires "conclusive" proof of an offense to sustain a conviction. Rather, it is our duty to affirm a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Lewis* (1981), 88 Ill. 2d 129, 151.) When circumstantial evidence is relied upon by the State, as it was here, the conviction should be affirmed if such evidence "is inconsistent with any reasonable hypothesis of innocence ***." *People v. Rhodes* (1981), 85 Ill. 2d 241, 249.

The majority does not advance any hypothesis of innocence, reasonable or otherwise. No attempt is made to reconcile the critical fact that Lampton was found on the evening of his death without any money, despite uncontradicted evidence that he had cashed a $286.88 paycheck earlier that day. No explanation is offered for the disappearance of Lampton's watch and wallet, and I certainly do not understand the majority's virtual disregard of Howell's statements that he saw defendant bend over Lampton's body, that defendant went through Lampton's

pockets, and that defendant appeared to remove Lampton's watch. Thus, while acknowledging that armed robbery may be proved by circumstantial evidence, the majority seemingly ignores such evidence here. Why did defendant approach and shoot a complete stranger if not to rob him? Why did defendant bend over the body after the murder and go through the victim's pockets? What became of Lampton's money, wallet and watch? Why did Howell claim that defendant removed Lampton's watch? The majority opinion leaves these questions unanswered, and I can conceive of no hypothesis from this record that is both reasonable and consistent with defendant's innocence. I would therefore affirm the armed-robbery conviction.

The majority decision also reverses the death sentence, since the statutory aggravating factor has been eliminated. Because I would affirm the armed-robbery conviction, and find no error in the death sentence hearing, I would affirm the death sentence as well.

RYAN, C.J., and MORAN, J., join in this dissent.