# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Martin*, 2012 IL App (1st) 093506

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SPENCER MARTIN, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-09-3506 |
| Filed | March 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for attempted first degree murder and aggravated battery with a firearm were upheld over his contentions that evidence of other crimes was improperly admitted, his sentence was excessive, the sentence was improperly made consecutive to his sentence in an unrelated case and the prospective jurors were not asked if they both understood and accepted the *Zehr* principles, since the admission of the other crimes evidence was harmless, the sentence was not manifestly disproportionate to the offenses, the consecutive sentences were consistent with the requirements of the Unified Code of Corrections, and the admonitions given were sufficient under Supreme Court Rule 431(b); however, the DNA charge was vacated on the ground defendant's DNA was already in the DNA database. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-6677; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed; charge vacated. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Brian E. Koch, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Kalia M. Coleman, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE J. GORDON delivered the judgment of the court, with opinion. Presiding Justice Epstein and Justice Howse concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a jury trial in September 2009, defendant, Spencer Martin, was found guilty of two counts of attempted first degree murder and two counts of aggravated battery with a firearm for the January 2006 shootings of Bryan Williams (Bryan) and Johnny Williams (Johnny). Defendant was sentenced to two consecutive terms of 55 years' imprisonment, to be served consecutively with a 24-year sentence for his involvement in an unrelated shooting. This appeal followed.

¶ 2                    I. BACKGROUND

¶ 3                    A. Trial

¶ 4    Following the January 14, 2006 shootings of Bryan and Johnny, defendant was indicted on four counts of attempted first degree murder, two counts of aggravated battery with a firearm, and four counts of aggravated battery. The following evidence was adduced at defendant's jury trial.

¶ 5    Johnny and Bryan Williams both testified for the State at trial. They each stated that at approximately 10 p.m. on January 14, 2006, they, along with their cousins Terry Hawkins and Ronald Jackson, and Ronald's one-year-old son, drove to a Fat Albert's restaurant located at 69th and Ashland Street in Chicago to get food. Johnny testified he parked the vehicle on the west side of the street and that he and the others began walking south toward the restaurant. As they approached the restaurant, Johnny was bumped by a man that he did not know. Johnny asked the man what was going on, and another man standing next to him, later identified as defendant, replied "we are not on that." Johnny and his companions then entered the restaurant.

¶ 6    Subsequently, within a few minutes, Johnny, Bryan, and their cousins exited the restaurant and began walking back to their vehicle. As they did so, Johnny was bumped again

-2-

by the same man who bumped him earlier. Johnny and the man exchanged words and a fight began between the man, Johnny, and Bryan. During the fight, defendant pulled out a chrome, semiautomatic .380-caliber handgun and fired four or five shots at Johnny and Bryan. Johnny was struck once in the left wrist and Bryan was struck once in the pelvis. After the shooting began, Johnny ran north on Ashland Street toward his vehicle, while Bryan ran east into an alley. Defendant and the other man ran west through a gangway between two buildings. Johnny got into his vehicle and picked up Bryan and his cousins. By that time, a police officer had arrived and asked Johnny which direction defendant ran. Johnny then drove to Holy Cross Hospital.

¶ 7   Johnny testified that the area of the shooting was well lit by streetlights and a large sign in front of the restaurant. He and Bryan both stated that they were close to defendant when the shots were fired. Johnny stated that he was "looking directly at [defendant's] face when [defendant] pulled the gun and started to shoot." He further said that he was able to observe defendant for 10 to 15 seconds. He described defendant as wearing all black clothing, with black hair, and fair, light skin, and weighing approximately 190 pounds. Bryan testified that he was approximately three feet away from defendant. According to Bryan's testimony, defendant was about 5 feet 7 inches tall, weighing between 140 and 150 pounds, with a brown complexion and braids in his hair.

¶ 8   Officer Patrick Lee Palmer testified that at approximately 10 p.m. on June 14, 2006, he received a dispatch call reporting shots fired at 6854 South Ashland Street, near Fat Albert's restaurant. When he arrived at the scene, he learned from restaurant patrons who had witnessed the shooting that the shooter was a black male. He testified that the area where the shooting occurred was "pretty well lit" due to streetlights in the area and the illuminated awning in front of Fat Albert's.

¶ 9   Palmer averred that after leaving Fat Albert's, he spoke to Johnny and Bryan at Holy Cross Hospital, where Johnny described the shooter as being 5 feet 8 inches tall, 190 pounds, dressed in a black hat, a tan coat, and black pants, and armed with a chrome handgun.

¶ 10   Phillip Campbell, a retired Chicago police department evidence technician, testified that on the evening of January 14, 2006, he reported to a crime scene near Fat Albert's restaurant where he discovered three "Winchester .380" cartridge casings in front of an abandoned building next door to the restaurant. The casings were then sent to the Illinois State Crime Police Laboratory (ISCP lab) for analysis.

¶ 11   Kurt Murray, a forensic chemist at the ISCP lab, testified that on January 25, 2006, he received a request to examine three Winchester .380 cartridges, which he concluded were fired from the same firearm. After making this determination, he entered one of the cartridges into the Integrated Ballistic Identification System (IBIS) to see if it matched any other cartridges that were in the database. Murray explained that IBIS serves as the ISCP lab's "computerized unsolved case file" which records images of the microscopic irregularities in cartridges and then compares them to images in the database from other cases and ranks them based on the degree of similarity. He testified that after entering the cartridge into IBIS, the system was unable to find a sufficiently similar match.

¶ 12   Detective Brian Lutzow testified that in February 2006, he became involved in an

unrelated investigation of a domestic dispute in which an individual named Erlin Pinnix was shot. He testified that he was later informed that the cartridge cases taken from the Pinnix shooting matched those recovered from the scene in the current case.

¶ 13    Prior to trial, the State filed a motion *in limine* seeking the introduction of the testimony of Pinnix to establish defendant's identity by showing that he was shot by defendant with the same weapon used in the instant case. Prior to his testifying, the court admonished the jury that Pinnix's testimony was going to be admitted for the limited purpose of identifying defendant. Specifically, the court stated:

> "[T]he defendant was involved in an offense other than that charged in this indictment. This evidence is being received on the issues of the defendant's identification, and it may be considered by you only for that limited purpose. It's for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to that evidence on the issue of identification."

¶ 14    Pinnix then testified that at approximately 2 a.m. on February 4, 2006, he was driven in a friend's vehicle to a gas station at 755 West Lawrence in Chicago. He exited the vehicle and approached the service window to purchase potato chips and water. As he waited, he saw an acquaintance, Earl Willis, with whom he spoke briefly before Willis got into his vehicle. Pinnix purchased his items, and as he turned to get back into the vehicle, he was met by defendant, who pointed a "silver, shiny" gun to his forehead. Pinnix stated that the gas station was well lit and that he recognized defendant from his neighborhood, having seen him with Willis numerous times. While pointing the gun at his head, defendant demanded of Pinnix, "give me what you got," and Pinnix reached into his pockets to give defendant his money. Pinnix testified that defendant then got distracted at which time Pinnix grabbed for the gun. A scuffle between the two men ensued and "the gun went off." Pinnix was shot in the pelvis. After he was shot, Pinnix continued to struggle with defendant for approximately 45 more seconds, at which time defendant walked away. Defendant then returned and attempted to shoot Pinnix twice, but his weapon would not fire. Defendant then began to walk away again, but turned around, cocked the gun, and attempted to fire again, but the weapon would not fire. Defendant then entered Willis's vehicle and left the gas station.

¶ 15    Pinnix further testified that a few days later, he spoke with police and told them that defendant had shot him. On March 23, 2006, Pinnix identified defendant from a photographic array and from a physical lineup.

¶ 16    Following Pinnix's testimony, the defense moved for the trial court to declare a mistrial because the admission of that testimony "poisoned" the jury against defendant. The trial court denied that motion, stating that Pinnix's testimony was "admitted solely on the issue of the defendant's identification, which is an issue in this case."

¶ 17    Officer Carla Rodriguez, an evidence technician for the Chicago police department, testified next for the State. She stated that at approximately 2 a.m. on February 4, 2006, she was assigned to assist in the investigation of the Pinnix shooting. At the scene of the shooting, she recovered "one live round and one expended shell."

¶ 18    Peter Brennan, a former forensic scientist at the ISCP lab, testified that on April 28, 2006, he examined the two cartridges recovered by Officer Rodriguez and determined that they

came from the same weapon. He then entered the fired cartridge into IBIS and determined that there were similarities between the cartridge from the Pinnix shooting and those from the instant case. Brennan further testified that on May 12, 2006, he examined the cartridges from both shootings and concluded that they were all fired from the same weapon.

¶ 19　　Johnny and Bryan testified that on May 23, 2006, they went to the Area 2 police station to view a photographic array, from which they each separately identified defendant as their shooter. The two further testified that on March 13, 2008, they each separately viewed a physical lineup and positively identified defendant as the shooter. The State then rested.

¶ 20　　Defendant did not call any witnesses. Before resting, the defense read into evidence a stipulation that "if the Genesis Clinical Laboratory were called, they would tell us that in fact Erlin Pinnix on February 4, 2006, had 170 milligrams [per deciliter] of alcohol in his blood." Afterwards, the defense then rested.

¶ 21　　Following closing arguments, the court again admonished the jury that it could only consider the evidence relating to the Pinnix shooting for the limited purpose of determining defendant's identification as the shooter in the instant case. The jury found defendant guilty of two counts of attempted first degree murder and two counts of aggravated battery with a firearm, finding that he personally discharged a firearm during the attempted murders and proximately caused great bodily harm to Johnny and Bryan.

¶ 22　　　　　　　　　　　　　　B. Sentencing

¶ 23　　Defendant's sentencing hearing was held on November 4, 2009. The presentence investigation report revealed that defendant had juvenile adjudications for possession of a stolen motor vehicle and criminal trespass to a vehicle, as well as other sentences for a variety of crimes committed as an adult, including possession of a controlled substance, criminal trespass, and the unlawful use of a weapon. The report indicated that defendant was also currently serving a 24-year sentence for attempted first degree murder and attempted armed robbery in the Pinnix case. The report further indicated that defendant had never been employed and had supported himself by selling drugs.

¶ 24　　The court sentenced defendant to two consecutive terms of 55 years' imprisonment for the two counts of attempted first degree murder, having merged them with the two counts of aggravated battery with a firearm. In support of its decision, the court noted that Bryan's gunshot wound, and arguably Johnny's as well, qualified as a severe bodily injury sufficient to trigger a mandatory consecutive sentence. The court further stated:

　　　　"I think that the statute now requires because of what you were convicted of, Mr. Martin, with regard to [the Pinnix shooting], and both of those matters were triggers as well, so I think that the law now requires that any sentence on this case run consecutively to that case.

　　　　If I am wrong about that, I would state for the record that if it were up to me, I would not run this sentence consecutively with your prior conviction in the [Pinnix] case, but I don't think that I have any choice in the matter."

¶ 25　　The court then listed several factors in aggravation and mitigation. In aggravation, the

court noted that defendant had "a very bad record" with several prior felony convictions and that he was "just too dangerous to be allowed walking around." In mitigation, the court noted that defendant had a good relationship with his family and "had some success" in school, but that these factors were not "overly significant" when "stacked up against whatever [he had] done on the street."

¶ 26    Defendant then filed a motion to reconsider his sentence, which was denied, and this appeal followed.

¶ 27                                    C. Jury Selection

¶ 28    In addition to the foregoing, defendant contends that the court erred during jury selection in failing to comply during *voir dire* with the *Zehr* principles enumerated in Supreme Court Rule 431(b). Ill. S. Ct. R. 431 (eff. May 1, 2007).

¶ 29    Jury selection for defendant's trial commenced on September 11, 2009. During *voir dire*, the trial court questioned potential jurors about the principles enumerated in Supreme Court Rule 431(b), stating:

> "Now, a defendant is presumed to be innocent of the charges against him. This presumption remains with the defendant throughout the trial, and it is not overcome unless by your verdict you find the State has proven the defendant guilty beyond a reasonable doubt. *Does anybody have any quarrel with this proposition of law, presumption of law*? If so, raise your hand. Record reflect there are none.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. *Anybody have any quarrel with this proposition of law, the burden of proof*? If so, raise your hand. Record reflect there are none.
>
> A defendant is not required to prove his innocence. *Does anybody have any quarrel with this proposition of law*? If so, raise your hand. Record reflect there are none. The defendant has an absolute right to remain silent, sit there and rely on his presumption of innocence. You are to draw no inference from the fact that the defendant chooses to remain silent, either in favor of or against the defendant because he elects to remain silent. *Anybody have any quarrel with this proposition of law, right of the defendant to remain silent*? If so, raise your hand. Record reflect there are none.
>
> ***
>
> Is there anybody here who could not apply those four principles of law in the manner I have indicated? If so, raise your hand, now is the time to tell me. All right, record reflect there are none." (Emphases added.)

¶ 30    The court did not specifically ask potential jurors whether they both "understood and accepted" those principles. Following the examination of prospective jurors, a jury was empaneled and defendant's trial commenced.

¶ 31                                    II. ANALYSIS

¶ 32    Defendant raises five separate arguments on this appeal: (1) that the trial court erred

-6-

when it admitted other crimes evidence to show defendant's identity, (2) that his sentence was excessive in light of the nonseverity of his crimes, (3) that the trial court erred in sentencing him consecutively to his sentence in the Pinnix case, (4) that the trial court erred by failing to ask prospective jurors whether they both *understood* and *accepted* the principles enumerated in Supreme Court Rule 431(b), and (5) that his $200 DNA indexing charge was improper. For the reasons that follow, we affirm defendant's conviction and sentence, but vacate his DNA charge.

¶ 33                    A. Admission of Evidence of Other Crimes

¶ 34      Defendant first contends that the trial court erred when it allowed the State to present evidence that he shot Erlin Pinnix with the same weapon that was used to shoot Bryan and Johnny, arguing that the links between the two shootings were too attenuated and the evidence too prejudicial to be admissible. The State, however, asserts that the court properly exercised its discretion in admitting this evidence for the limited purpose of establishing defendant's identity and, in the alternative, that even if the admission was erroneous, any such error was harmless in light of the overwhelming evidence of defendant's guilt. We agree with the State.

¶ 35      A court's decision of whether to admit evidence of other crimes will not be reversed absent an abuse of discretion. *People v. Johnson*, 406 Ill. App. 3d 805, 808 (2010). Such an abuse will be found only where "the trial court's evaluation is unreasonable, arbitrary, or fanciful, or where no reasonable person would adopt the trial court's view." *Johnson*, 406 Ill. App. 3d at 808. Evidence of crimes for which a defendant is not on trial is inadmissible to show that defendant's propensity to commit a crime. *People v. Quintero*, 394 Ill. App. 3d 716, 725 (2009). Such evidence may, however, be admitted when relevant to prove any other material issue in a case, including defendant's identity. *People v. Monroe*, 366 Ill. App. 3d 1080, 1090 (2006) (citing *People v. Kimbrough*, 138 Ill. App. 3d 481, 484 (1985)). Other crimes evidence may be admissible to show identity by "link[ing] the defendant to the offense at issue through some evidence, typically an object, from another offense." *Quintero*, 394 Ill. App. 3d at 727.

¶ 36      Defendant, however, claims that Pinnix's testimony was inadmissible because of "significant differences" between the Pinnix shooting and the shootings in the instant case, including the number of victims, the number of perpetrators, and the nature and setting of the two crimes, and relies on the recent case of *People v. Johnson*, 406 Ill. App. 3d 805 (2010), in support of this contention. This reliance is misplaced.

¶ 37      In *Johnson*, the State was allowed to introduce evidence of other uncharged sexual assaults committed by the defendant in order to show his *intent* to sexually assault the victim. *Johnson*, 406 Ill. App. 3d at 806.[1] The appellate court found that significant dissimilarities

---

[1]As an exception to the general rule, in sexual assault cases, a trial court may admit evidence of other crimes to show a defendant's propensity to commit sex offenses if the court determines that the evidence is relevant and its probative value is not outweighed by its prejudicial effect. See 725 ILCS 5/115-7.3(c) (West 2006).

existed between the charged and uncharged assaults, including the number of perpetrators present. The appellate court found that these dissimilarities, coupled with the fact that the trial court failed "to conduct any sort of 'meaningful' analysis of the prejudicial effect of the other-crimes evidence," led to the conclusion that the other crimes evidence was improperly admitted. *Johnson*, 406 Ill. App. 3d at 812.

¶ 38    The instant case differs significantly from *Johnson*. Unlike *Johnson*, the other crimes evidence here was used to establish defendant's identity, not his intent or propensity to commit crimes. That evidence, which indicated that defendant used the exact same firearm to shoot Pinnix that was used to shoot Johnny and Bryan, was highly relevant to establishing defendant's identity as the shooter. While a defendant's intent to commit an act of sexual assault in one instance may not be admissible to prove his intent to do so in another, unrelated instance, the same rationale does not hold true for proving a defendant's identity through his possession of a firearm since the identity of the possessor remains constant, regardless of variances in the crimes in which that firearm is used.

¶ 39    It therefore follows that the fact that differences existed between the two shootings does not have an impact on the admissibility of that evidence. Our supreme court has "never suggested that other crimes must be identical to the crime charged before evidence of them is admissible." *People v. Richardson*, 123 Ill. 2d 322, 339 (1988). While the number of perpetrators may have differed here, the relevant details are the same: there was only one shooter and one firearm involved in each altercation, and the other crimes evidence strongly indicated that both the shooter and the weapon were the same in both shootings. See generally *People v. Donoho*, 204 Ill. 2d 159, 184-85 (2003); *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991).

¶ 40    Contrary to his assertion, the three Illinois Supreme Court cases, *Richardson*, *People v. Coleman*, 158 Ill. 2d 319, 335 (1994), and *People v. Taylor*, 101 Ill. 2d 508 (1984), which defendant ostensibly cites in his brief, in fact support the conclusion that the other crimes evidence in this case was properly admitted. Despite factual differences between the crimes in these cases, the court, in each instance, allowed the State to admit evidence that the same firearm was used in other crimes committed by the defendant in order to prove his identity.

¶ 41    In *Richardson*, the court was faced with a similar situation where, at the defendant's trial for murder and armed robbery, the jury heard evidence regarding another armed robbery committed by the defendant, including testimony that the defendant was the shooter and that the same weapon was used in both crimes. *People v. Richardson*, 123 Ill. 2d 322, 339 (1988). Upholding the trial court's decision to admit this other crimes evidence, our supreme court held even though the two crimes were not identical and that the State may have elicited more details than minimally necessary to establish defendant's identity, the other crimes evidence was nevertheless admissible because it "clearly tended to identify defendant as the perpetrator of the [crime charged], in light of the evidentiary links between the two crimes." *Richardson*, 123 Ill. 2d at 339-40.

¶ 42    Similarly, in *Coleman*, the defendant disputed the trial court's decision to admit evidence of his involvement in another murder for the purpose of proving his identity. *People v. Coleman*, 158 Ill. 2d 319, 335 (1994). The Illinois Supreme Court upheld the trial court's

decision to admit that evidence. Relying on *Richardson*, the court held that the other crimes evidence, which indicated that the defendant shot and killed another individual using the same weapon that killed the victim, was "relevant and admissible" evidence of the defendant's identity. *Coleman*, 158 Ill. 2d at 335. See also *People v. Taylor*, 101 Ill. 2d 508 (1984) (evidence that the defendant committed an armed robbery with a large silver gun was admissible to show the defendant's identity as the perpetrator of the charged crimes, which were committed using a gun with a similar description).

¶ 43     Even if we were to accept defendant's contention that the admission of the other crimes evidence was improper, which we categorically do not, we would nevertheless agree with the State's assertion that such an admission would amount to harmless error. The "improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000).

¶ 44     Here, the record indicates that the evidence of defendant's guilt, even without the other crimes evidence, was overwhelming. Both Johnny and Bryan testified that they identified defendant as the shooter in both photographic arrays and in physical lineups. They stated that the were close to defendant when he shot them and that the area of the shooting was well lit. Johnny testified that he was "looking directly at [defendant's] face when he pulled the gun and started to shoot," and observed defendant for 10 to 15 seconds. Thus, based on the two separate eyewitness identifications of defendant as the shooter, it is likely that any error associated with the admission of the other crimes evidence was harmless.

¶ 45                                              B. Excessive Sentencing

¶ 46     Defendant next argues that the court erred by sentencing him to two consecutive 55-year prison terms, the maximum sentence that could have been imposed. He contends that this is the equivalent of a natural life sentence and, in light of his criminal history, is too severe. Defendant therefore asks us to either reduce his sentence or remand his case for resentencing before a different judge. The State, however, argues that the court was well within its discretion to sentence defendant as it did and urges us to affirm his sentence. We agree with the State.

¶ 47     "A trial court is generally considered the best place to determine a defendant's sentence; therefore, we will not disturb that sentence absent an abuse of discretion." *People v. Velez*, 388 Ill. App. 3d 493, 514 (2009). That discretion is not unfettered, however. Even in instances where a sentence is within the proscribed statutory limitations, " 'an abuse of discretion may be found where the sentence greatly varies with the purpose and spirit of the law.' " *Velez*, 388 Ill. App. 3d at 515 (quoting *People v. Maldonado*, 240 Ill. App. 3d 470, 485 (1992)). Put another way, a sentence within the statutory limits will only constitute an abuse of discretion if "it is manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). A trial court's sentencing decision must strike a balance between the seriousness of the offense and a defendant's rehabilitative potential. *Maldonado*, 240 Ill. App. 3d at 485.

¶ 48     It is well established that a trial court "need not articulate the process by which it

determines the appropriateness of a given sentence." *People v. Wright*, 272 Ill. App. 3d 1033, 1045-46 (1995). The court "is not required 'to detail for the record the process by which [it] concluded that the penalty [it] imposed was appropriate.' [Citation.]" *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Instead, the court must consider "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *Maldonado*, 240 Ill. App. 3d at 485-86 (citing *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990)).

¶ 49    Pursuant to Supreme Court Rule 615(b)(4) (Ill. S. Ct. R. 615(b)(4)) we have the authority to reduce an excessive sentence where the record demonstrates that the trial court abused its discretion. *People v. Clark*, 374 Ill. App. 3d 50, 69 (2007). A reviewing court may not, however, "substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53-54 (1999) (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991)).

¶ 50    Here, defendant was sentenced to two consecutive terms of 55 years' imprisonment for attempted first degree murder. Attempted first degree murder is a Class X felony, which generally carries a sentencing range of 6 to 30 years. 720 ILCS 5/8-4(c)(1)(D) (West 2006). However, when a defendant personally discharges a firearm during the commission of that offense and proximately causes great bodily harm, an additional term of 25 years to life imprisonment will be mandatorily imposed. 730 ILCS 5/5-8-1(a)(3) (West 2006). While defendant is arguably correct that his combined prison terms likely constitute a *de facto* life sentence, we nevertheless cannot say that the trial court abused its discretion in imposing such a sentence.

¶ 51    The record indicates that defendant opened fire in a public space, with numerous people, including Johnny and Bryan's one-year-old relative, nearby. Defendant fired four to five shots, but only struck each man once, Johnny in the wrist and Bryan in the pelvis. Johnny testified that the bullet broke several bones in his wrist, which impaired its flexibility, while Bryan stated that he spent a week in the hospital because of his injuries and that the bullet was still lodged in his pelvis.

¶ 52    Moreover, the record indicates that the court comprehensively took into account the pertinent factors in aggravation and mitigation in making its decision. The court stated that mitigating factors, including defendant's familial relationships, his education, and his employment history, did not outweigh his substantial criminal record, which includes convictions for attempted first degree murder and attempted armed robbery for the Pinnix shooting, aggravated unlawful use of a weapon, and several drug-related offenses. At the sentencing hearing, the court noted that it considered defendant's "prior criminal history consisting of *** five other felony convictions, one of which [was] a crime of violence, in which the Defendant shot someone else with the same gun." The court further stated that it was imposing the maximum sentence in order to "protect the public" because of the magnitude and volume of defendant's previous criminal activity, and also that the maximum sentence was "necessary for the rehabilitation of the Defendant, and should such a thing be possible."

¶ 53    Defendant has failed to provide any authority that would compel us to reach a different result than the trial court. We are unable, as defendant would have us do, to "substitute [our] judgment for that of the trial court simply because [we] would have weighed the factors differently." *Jackson*, 375 Ill. App. 3d at 800-01. In light of the severity of the crime charged, defendant's criminal background, and factors in aggravation and mitigation, we cannot say that defendant's sentence was manifestly disproportionate to the nature of the offense. Accordingly, the trial court did not abuse its discretion in imposing such a sentence.

¶ 54                              C. Consecutive Sentences

¶ 55    Defendant next argues that the trial court erred by ordering him to serve his two consecutive 55-year sentences in the instant case consecutively, rather than concurrently, with his 24-year sentence in the Pinnix case. He does not object to serving those two 55-year sentences consecutively to one another, but challenges the court's decision to make him serve those sentences consecutively to his preexisting 24-year sentence. Contrary to the court's assertion that it was mandated by section 5-8-4(a) (735 ILCS 5/5-8-4(a) (West 2006)) (the statute) of the Unified Code of Corrections, as it existed at the time, to make defendant's two sentences in this case run consecutively to his preexisting 24-year sentence from the Pinnix case, defendant contends that no such mandate is imposed by that section. He asserts that since the court based its imposition of consecutive sentences based on its incorrect interpretation that such consecutive sentencing was mandatory, we should *sua sponte* modify his sentence in the instant case be served concurrently to his 24-year preexisting sentence from the Pinnix shooting.

¶ 56    While the State contends that there was no error in sentencing defendant, it further argues that even if there would have been an error, defendant has forfeited review of this issue because he did not challenge his sentence within 30 days following its imposition, as required by law. 730 ILCS 5/5-4.5-50(d) (West 2008) (formerly 730 ILCS 5/5-8-1(c) (West 2006).

¶ 57    In response, defendant urges that forfeiture would not apply here because when a court fails to conform to statutory sentencing requirements, the resulting sentence is void and correctable at any time by this court. *People v. Arna*, 168 Ill. 2d 107, 113 (1995). We disagree. Defendant does not argue that the court could not have imposed these sentences consecutively pursuant to its discretionary authority under section 5-8-4(a). He contends only that the court was bound by its own allegedly incorrect assertion that the imposition of consecutive sentences was mandatory.

¶ 58    We therefore cannot agree that the sentence imposed in this case was unauthorized, as was the case in *Arna*, but merely that the court was allegedly mistaken as to the nature of its authority but not as to whether such authority existed. Defendant cannot suggest that the sentence in this case was unauthorized, but merely that it was not mandatory but could have been entered pursuant to the court's discretionary authority. Arguably, this would not render the sentence void but, at best, voidable insofar as it would allow the court to reconsider whether it would allow that sentence to be imposed, albeit not because it was mandatory, but in the exercise of its discretion. However, we need not resolve that issue because, for the

reasons discussed below, we find that no error was in fact committed by the court in construing the statute so as to render the imposition of consecutive sentences in this case mandatory and not discretionary.

¶ 59    We therefore cannot conclude that his consecutive sentence is not in compliance with the statutory requirements, but merely that it may not have been in compliance with the court's recognition of its statutory authority to impose the sentence. This would only be because of the court's alleged mistaken assumption as to whether it was imposing the sentence pursuant to the mandatory provisions or its discretionary provisions. However, we need not consider whether these sentences were in compliance with the discretionary provisions of the statute since, as discussed below, we find no error in imposing these sentences consecutively because doing so was, in fact, mandated by the statute.

¶ 60    Because under either approach we must determine whether the imposition of consecutive sentences was appropriate, we will address the merits of this contention. For the reasons that follow, we agree with the State.

¶ 61    Issues of statutory interpretation, such as this one, are legal questions that are reviewed *de novo*. *People v. Caballero*, 228 Ill. 2d 79, 82 (2008). "When construing a statute, our fundamental objective is to ascertain and give effect to the legislature's intent, best indicated by the plain and ordinary meaning of the statutory language." *People v. Garcia*, 241 Ill. 2d 416, 421 (2011). Where the language of a statute is clear and unambiguous, we must apply the statute without the aid of statutory construction. *People v. Tucker*, 167 Ill. 2d 431, 435 (1995).

¶ 62    Section 5-8-4(a), as it existed when the crimes were committed, provides:

"When multiple sentences of imprisonment are imposed on a defendant at the same time, or when a term of imprisonment is imposed on a defendant who is already subject to sentence in this State or in another state, or for a sentence imposed by any district court of the United States, the sentences shall run concurrently or consecutively as determined by the court. *** When a term of imprisonment is imposed on a defendant by an Illinois circuit court and the defendant is subsequently sentenced to a term of imprisonment by another state or by a district court of the United States, the Illinois circuit court which imposed the sentence may order that the Illinois sentence be made concurrent with the sentence imposed by the other state or district court of the United States. The defendant must apply to the circuit court within 30 days after the defendant's sentence imposed by the other state or district of the United States is finalized. The court shall impose consecutive sentences if:

(i) one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury[.]" 730 ILCS 5/5-8-4(a)(i) (West 2006).

¶ 63    Thus, under its plain language, section 5-8-4(a) indicates that when a defendant is already subject to a preexisting sentence, the sentences may run either consecutively or concurrently, depending on whether certain criteria are met. 730 ILCS 5/5-8-4(a) (West 2006) (for a defendant "who is already subject to a sentence in this State *** the sentences shall run concurrently or consecutively as determined by the court").

¶ 64    Our supreme court in *Tucker* made it clear that the statute removes any impediment to the imposition of consecutive sentencing, even as to preexisting sentences. There, the court explained that "[a]s the statute provides for the imposition of a consecutive sentence on a defendant already subject to a sentence, *both sentences are 'involved'* under the statutory scheme." (Emphasis added.) *Tucker*, 167 Ill. 2d at 436. This language represents a clear statement by our supreme court that the application of section 5-8-4(a) is not limited to the crimes a defendant is currently being sentenced for but, rather, applies to all sentences that satisfy the statutory requirements.

¶ 65    Defendant nevertheless contends that even if consecutive sentences were permissible, they were not mandatory, as the court asserted, and defendant therefore urges us to modify his sentences to be served concurrently with his sentence in the Pinnix case. As stated above, the court indicated that it was only sentencing defendant consecutively because it was its belief that the law required it. Contrary to the State's bald assertion, the record is clear that the court sentenced defendant to consecutive sentences *only* because it thought that doing so was mandatory, stating "that if it were up to me, I would not run this sentence consecutively with your prior conviction in the [Pinnix] case, but I don't think that I have any choice in the matter." The law is clear that when a court "purports to act pursuant to a provision which it has incorrectly interpreted as mandatory when it is in fact discretionary, the proper course is to remand the case to allow the trial court to exercise its discretion." *People v. Edwards*, 259 Ill. App. 3d 151, 157 (1994). That being said, we nevertheless agree with the court that his consecutive sentencing was mandatory, rather than discretionary, under the statute.

¶ 66    Section 5-8-4(a)(i) mandates that a court "shall" impose a consecutive sentence where "one of the offenses for which defendant was convicted was *** a Class X *** felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-4-8(a)(i) (West 2006) . The use of *shall* in subsection 5-8-4(a)(i), rather than *may*, as used in section 5-8-4(a), evinces a clear intent by the legislature to require a court to sentence a defendant consecutively when he is already serving a sentence for a Class X felony involving severe bodily injury. Nothing in the language of this section, or in that of the statute as a whole, suggests, as defendant contends, that the language of subsection 5-8-4(a)(i) only applies to the offenses charged in the instant case.

¶ 67    We find no basis upon which to impose an unwritten limitation upon the statutory language of section 5-8-4(a)(i), that "one of the offenses for which defendant was convicted," so as to limit its application only to current sentences, but not preexisting sentences as well. Such an interjected limitation would be inconsistent with our supreme court's interpretation of the statute in *Tucker*, where the court explicitly indicated that both a defendant's prior and current sentences "are 'involved' under the statutory scheme," (*Tucker*, 167 Ill. 2d at 436) and would permit all such sentences to "run concurrently or consecutively as determined by the court." 730 ILCS 5/5-8-4(a) (West 2006). In light of this language, as construed in *Tucker*, we see no valid basis upon which to extend the imposition of consecutive sentencing to preexisting sentencing under the enabling provisions of section 5-8-4(a), which allows such sentencing on either a discretionary or mandatory basis, yet at the same time exclude preexisting sentencing on a mandatory basis under the provisions of subsection 5-8-4(a)(i).

¶ 68    We are not persuaded by defendant's attempts to rely on sections 5-8-4(f) through 5-8-

4(i), which he contends are the only specific sections of the statute that mandate consecutive sentences. Those provisions provide for mandatory consecutive sentencing for specific crimes committed under limited circumstances, and do not purport to be exclusive so as to exclude all other instances for which consecutive sentences are also mandated. As our supreme court noted in *Tucker*, those provision "provide for mandatory consecutive sentences for crimes committed while an inmate in the Department of Corrections [citation], for escape or attempted escape [citation], for felonies committed while on pretrial release or pretrial detention [citation], and for felonies committed while free on bond or while detained following conviction of a felony [citation]." *People v. Tucker*, 167 Ill. 2d at 438. Accordingly, sections 5-8-4(f) through 5-8-4(i) do not preclude the imposition of mandatory consecutive sentences when a defendant is already subject to a sentence for another crime involving severe bodily injury.

¶ 69 Therefore, because defendant's sentence in the Pinnix shooting, as well as those in the instant case, fell under section 5-8-4(a) because they were for Class X felonies involving severe bodily injury, the trial court did not err in sentencing defendant to consecutive sentences consistent with the requirements of the Unified Code of Corrections.

¶ 70 D. Rule 431(b) Instruction

¶ 71 Defendant further contends that the trial court erred during *voir dire* when it failed to comply with Supreme Court Rule 431(b) by asking potential jurors whether they had "any quarrel" with those principles, rather than explicitly asking them whether they "understood and accepted" them. Initially, the State contends that defendant has forfeited this issue by failing to make an objection and include the issue in his posttrial motion. Defendant concedes this point, but asks us to review it under the first prong of the plain error doctrine, which allows us to review an unpreserved error where the evidence is closely balanced, regardless of the seriousness of the error. *People v. Davis*, 405 Ill. App. 3d 585, 590 (2010). The first step in a plain error analysis requires us to determine whether any error occurred at all. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). We find no error.

¶ 72 As amended in 2007, Supreme Court Rule 431(b) codified our supreme court's ruling in *People v. Zehr*, 103 Ill. 2d 472 (1984), and now requires a trial court to instruct a jury about the following four principles espoused in *Zehr*: (1) the defendant is presumed innocent; (2) the defendant must be proved guilty beyond a reasonable doubt; (3) the defendant is not required to produce any evidence; (4) the defendant's failure to testify cannot be held against him. *Zehr*, 103 Ill. 2d at 477. Rule 431(b) stipulates that a court must "ask each potential juror, individually or in a group, whether that juror understands and accepts" those four principles. Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 73 Defendant does not dispute that the court conveyed the requisite principles to the jury, but instead argues that the court's failure to explicitly ask jurors if they both "understood and accepted" those principles constitutes reversible error. We disagree.

¶ 74 In support of his claim, defendant relies primarily on the recent Illinois Supreme Court case of *People v. Thompson*, 238 Ill. 2d 598 (2010). In *Thompson*, our supreme court held that the trial court erred because it failed to admonish prospective jurors on all four *Zehr*

principles and neglected to ask them if they "accepted" those principles as required by Rule 431(b). *Thompson*, 238 Ill. 2d at 605-06. Specifically, the *Thompson* court held:

> "[T]he method of inquiry must provide each juror an opportunity to respond to specific questions concerning the [Rule 431(b)] principles. The committee comments emphasize that trial courts may not simply give a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law. [Citation.]
>
> Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 607.

¶ 75    The *Thompson* court nevertheless found that the court's violation of Rule 431(b) did "not automatically result in a biased jury" or render the defendant's trial "fundamentally unfair or unreliable in determining guilt or innocence," and thus, found that there was no plain error. *Thompson*, 238 Ill. 2d at 610-11, 612.

¶ 76    The appellate court has addressed this exact issue in the wake of *Thompson* and repeatedly upheld instructions that do not mirror verbatim the language of Rule 431(b). In *People v. Digby*, 405 Ill. App. 3d 544 (2010), decided only a month after *Thompson*, the trial court asked potential jurors whether they " 'had a problem' " with the presumption of the defendant's innocence, whether they " 'disagreed' " with the State's burden of proof, and whether they would hold the defendant's failure to testify " 'against' " him. *Digby*, 405 Ill. App. 3d at 548. Finding no error, the appellate court held that "[a]lthough the court did not use the precise language of Rule 431(b), the words it did use were appropriate and clearly indicated to the prospective jurors that the court was asking them whether they understood and accepted the principles enumerated in the rule." *Digby*, 405 Ill. App. 3d at 548. The court went on to note that the rule "does not set out principles in the form of questions to be asked *in haec verba*, and does not provide 'magic words' or 'catechism' to ensure the court's compliance." *Digby*, 405 Ill. App. 3d at 548 (citing *People v. Vargas*, 396 Ill. App. 3d 465, 472 (2009)).

¶ 77    Similarly, in *Quinonez*, also decided post-*Thompson*, this court was faced with a similar situation, where the trial court asked prospective jurors if they " 'had a problem' " with or " 'disagreed' " with the *Zehr* principles. *People v. Quinonez*, 2011 IL App (1st) 092333, ¶ 44. Affirming the holdings of several pre-*Thompson* cases, this court held that "[a]lthough the [trial] court did not use the precise language of Rule 431(b), the words that it did use clearly indicated to the prospective jurors that the court was asking them, not only whether they accepted the principles enumerated in the rule, but also whether they understood them. As a result, we find no error." *Quinonez*, 2011 IL App (1st) 092333, ¶ 50. See also *People v. Salcedo*, 2011 IL App (1st) 083148, ¶ 33. (finding no error when the trial court asked prospective jurors whether they had " 'any difficulty or quarrel' " with the *Zehr* principles because the word " 'difficulty' *** would certainly encompass a lack of understanding").

¶ 78    We are persuaded by the rationale espoused in these post-*Thompson* opinions. The

language used by the trial court here, asking prospective jurors whether they " 'had any quarrel' " with the *Zehr* principles, is sufficient to indicate that the court was asking them whether they understood and accepted those principles. Consequently, we find no error with respect to the court's Rule 431(b) admonitions to the jury. However even if such statements were erroneous, they would nevertheless fail to rise to plain error, as defendant contends because, as discussed above, the evidence in this case was not closely balanced.

¶ 79                    E. DNA Indexing Charge

¶ 80    Defendant finally contends, and the State concedes, that the court improperly assessed a $200 DNA indexing charge pursuant to 5-4-3(j). Our supreme court recently held that trial courts are authorized to take a defendant's DNA and require payment from him only where that defendant's DNA is not already in the State's DNA database. *People v. Marshall*, 242 Ill. 2d 285, 303 (2011). Because defendant is currently registered in the DNA database, this charge should be vacated.

¶ 81                        III. CONCLUSION

¶ 82    For the foregoing reasons, the judgment of the trial court is affirmed, and defendant's $200 DNA indexing charge is vacated.

¶ 83    Affirmed; charge vacated.